904 A.2d 511

**GEORGIA–PACIFIC CORPORATION, et al.**

**v.**

**Elsie L. BENJAMIN, Individually, etc.**

**No. 52, Sept. Term, 2005.**

Court of Appeals of Maryland.

Aug. 2, 2006.

62

Steven J. Parrott (Philip A. Kulinski and Ariel C. Gruswitz of DeHay & Elliston, L.L.P., Baltimore), for petitioners/cross-respondents.

Laura A. Cellucci (George M. Church of Miles & Stockbridge P.C., Baltimore), all on brief, for petitioners/cross-respondents.

Timothy J. Hogan (Law Offices of Peter T. Nicholl, Baltimore), on brief, for respondent/cross-petitioner.

Edward J. Lilly, Law Offices of Peter J. Angelos, P.C., Baltimore and Denis C. Mitchell, Stein, Mitchell & Mezines, Washington, DC, brief of Amicus Curiae Maryland Trial Lawyers Assoc., amicus curiae.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

In this case we must interpret Md.Code (1974, 2002 Repl. Vol.), §§ 3–904(g)(2) and 5–113(b) to determine whether the "discovery rule" applies to toll the limitations period for filing wrongful death and survival actions relating to an occupational disease. In the present case, both the wrongful death and survival actions were filed more than three years after the injured person's death. The Circuit Court for Baltimore City determined that both actions were barred by the statute of limitations and granted the defendants' motion for summary judgment. On appeal, however, the intermediate appellate court concluded that although the survival action was barred, the wrongful death action was not barred by limitations. For reasons to be explained in this opinion, we affirm the judgment of the Court of Special Appeals.

## BACKGROUND

On May 25, 1997, Robert L. Benjamin, Sr. (Mr. Benjamin) died of mesothelioma, a type of cancer in which a high percentage of cases are caused by asbestos exposure. On March 20, 2003, in the Circuit Court for Baltimore City, Mrs. Elsie Benjamin ("Mrs. Benjamin"), as personal representative of the estate of the decedent, Mr. Benjamin, filed a survival action against various defendants, including Georgia Pacific Corporation ("GP") and Union Carbide Corporation ("UC"). In the same complaint, Mrs. Benjamin and Mr. Benjamin's two surviving children, Robert L. Benjamin, II, and Carol Jeffers (collectively "the Benjamins"), filed a wrongful death action against the same defendants. Both UC and GP moved for summary judgment on the ground that both actions were barred by limitations. As to both motions, the trial court granted summary judgment.

On June 21, 2004, only Mrs. Benjamin, in her individual capacity and as personal representative for Mr. Benjamin, appealed to the Court of Special Appeals. On May 3, 2005, the Court of Special Appeals filed its opinion, in which it affirmed in part and reversed in part the trial court's judg-

ment. In affirming the trial court's judgment, the intermediate appellate court held that Mrs. Benjamin's survival action was barred by limitations. The court reversed as to the wrongful death action. It held that, as to that action, the evidence was insufficient, as a matter of law, to constitute inquiry notice. We granted the petition for *certiorari* filed by GP, UC, and Mrs. Benjamin. *Georgia–Pacific v. Benjamin*, 388 Md. 404, 879 A.2d 1086 (2005).[1]

---

1. Georgia Pacific, in its petition for a writ of certiorari, presented three questions for our review:
 1. Did the Court of Special Appeals err by concluding that § 3–904(g) requires knowledge of the cause of the occupational disease to trigger commencement of limitations in a wrongful death case?
 2. Did the Court of Special Appeals err by holding the plaintiffs' knowledge that Mr. Benjamin died of mesothelioma was insufficient to place them on inquiry notice?
 3. Did the Court of Special Appeals err by ruling that the applicable limitations period for a survival action must expire prior to the decedent's death in order to also bar a cause of action for wrongful death?"

 Union Carbide, in its petition for a writ of certiorari, presented three issues for our review:
 1. Whether the Court of Special Appeals erred in applying the discovery rule applicable to Md.Code (1974, 2002 Repl.Vol.), § 5–101 of the Cts. & Jud. Proc. Article to the wrongful death limitations period set forth in § 3–904(g)(2).
 2. Whether the Court of Special Appeals erroneously concluded that the wrongful death claimants were not placed on inquiry notice, even assuming that the discovery rule applies to § 3–904(g)(2)(ii).
 3. Whether the Court of Special Appeals erred in concluding that the knowledge of the personal representative cannot be imputed to the beneficiaries of a wrongful death action.

 Mrs. Benjamin, in her petition for a writ of certiorari, which we treat as a cross-petition for certiorari, presents two questions, requesting that we limit our review to the decision of the Court of Special Appeals which affirmed the dismissal of the survival action:
 1. Whether, for purposes of determining when the period of limitations begins to run under the discovery rule in an asbestos injury products liability action, an injured plaintiff is charged with inquiry notice despite that injured plaintiff's lack of knowledge of injury, causation and defendant wrongdoing.
 2. Whether the determination of when the period of limitations begins to run under the discovery rule in an asbestos injury product liability action may be resolved through summary judgment as a matter of law where no evidence exists in the record demonstrating that the injured plaintiff knew or should have

We affirm the judgment of the Court of Special Appeals and hold that application of the judicially developed discovery rule is consistent with the language contained in § 3–904(g)(2) of the Courts and Judicial Proceedings Article. Specifically, in cases involving workplace exposure to toxic substances, like asbestos, a claimant, including a wrongful death claimant, is on inquiry notice of the causation element of a cause of action to recover injuries resulting from an "occupational disease," e.g., mesothelioma when the claimant has knowledge that (1) the person whose injury forms the basis for the claim has been diagnosed with mesothelioma, and (2) the injured person was exposed to asbestos in the workplace. Further, we hold that in a survival action, if the decedent's knowledge is sufficient to satisfy the discovery rule, the decedent's knowledge is enough to trigger the running of the limitations period for the survival action.

## FACTS

We adopt, in large part, the facts as set forth by the Court of Special Appeals in its opinion:

In the complaint and in answers to interrogatories, [the respondents] [2] assert[ ] that the decedent was employed as a laborer and carpenter while (1) in the United States Navy from 1943 to 1945, (2) work[ed] for the L.H. Benjamin Co. from 1946 to 1961, and (3) work[ed] for the R.L. Benjamin Lumber Co. from 1961 to 1971. According to [the respondents], the decedent was exposed to asbestos containing products at various times throughout his employment, including while working for the Benjamin companies, which stocked and sold several products containing asbestos. The

---

known of a causal relationship between his disease and asbestos exposure, and where no record evidence demonstrates what, if any, general state of knowledge exists concerning the relationship between asbestos exposure and occupational disease.

2. We refer collectively to both Mrs. Benjamin, personal representative in the survival suit, and to the Benjamins, beneficiaries in the wrongful death suit, as the "respondents."

decedent was diagnosed with mesothelioma in early 1997, and he died on May 25, 1997.

*Benjamin v. Union Carbide,* 162 Md.App. 173, 180, 873 A.2d 463, 467 (2005).

Mr. Benjamin's death certificate indicated that the cause of death was "cancer (metastatic mesothelioma)." The respondents testified, as revealed in the affidavits and deposition testimony filed in these proceedings, that they discovered the nexus between asbestos exposure and cancer in late 2001 to early 2002, after the decedent's daughter, Carol Jeffers, read an article that stated that a high percentage of mesothelioma cases were caused by asbestos exposure.

In *Benjamin,* the Court of Special Appeals summarized the evidence, as stated in pertinent part:

### *Summary of medical reports, depositions, and affidavits*

A medical report, dated January 27, 1997, indicates that the decedent was referred to Dr. M. Jesada because of an abnormal chest x-ray and CAT scan. The report states that the decedent had periodic chest x-rays prior to December 1996, which were normal. As a result of a fall in November 1996, the decedent had various tests. The test included a chest X-ray, which was abnormal, and which was followed by a CAT scan, which was abnormal. According to the report, the decedent advised the physician that he had a history of asbestos exposure. Dr. Jesada's impression was possible mesothelioma, and a biopsy was recommended. Records from Harford Memorial Hospital reveal that the decedent was admitted on February 7, 1997, for a biopsy. An oncology report dated February 28, 1997, by Dr. Promila Suri, reflects a diagnosis of probable mesothelioma. The report indicates that the decedent stated that he had a history of exposure to asbestos in the workplace.

A report dated March 4, 1997, by Dr. Viroon Donavanik, indicates that the decedent was admitted to the Medical Center of Delaware on March 4. The report contains a confirmation of a diagnosis of mesothelioma and a recom-

mendation that decedent be treated with radiation and chemotherapy. The report again reveals that the decedent disclosed a history of asbestos exposure while working in a machine shop. The report further noted that decedent worked in the roofing and siding business.

[Mrs. Benjamin], in her affidavit, stated that she routinely attended medical appointments with the decedent in the spring of 1997, and that neither she nor the decedent was informed of the causal connection between asbestos exposure and mesothelioma. [Mrs. Benjamin] stated that she first learned of the connection ... [as late as] 2002, when her daughter read an advertisement which referenced the connection and told [Mrs. Benjamin] about it. [Mrs. Benjamin] testified that she never made any inquiries about the cause of mesothelioma prior to that time.

At the first motions hearing held on November 25, 2003, the court denied [these] motion[s] [by GP and UC and the other defendants] for summary judgment without prejudice, stating:

"Well ... I think the motion may be premature. And the reason I say that is that Mrs. Benjamin has not been deposed, and I gathered that from reading the papers, and I think that that ought to be done, because I don't want to make a decision in this case based upon an affidavit."

Following the hearing, [Mrs. Benjamin] was deposed on December 23, 2003. The pertinent testimony is as follows:

Q. Do you remember your husband telling Dr. Jesada that he had some exposure to asbestos in the past?

A. No.

Q. And you can't pinpoint one way or the other whether you were with your husband on January 27th, 1997 for that exam?

A. I can't remember the date.

\* \* \* \*

Q. I'm going to show you a report from Dr. Suri dated February 28th, 1997. Do you recall whether you were with

your husband on February 28th, 1997 when he went to see Dr. Suri?

A. I was with him almost every time—as far as I know, every time he saw her.

Q. I'm going to show you the report, but there's some reference in the report to your husband being exposed to asbestos when he was a carpenter. Do you remember at any time when you went to see Dr. Suri your husband ever making any mention of the fact that he had been exposed to asbestos while he was working as a carpenter?

A. I do not remember.

\* \* \* \*

Q. Did there come a time when your husband, as a result of his cancer, went to the Medical Center of Delaware?

A. That's where he got the radiation treatments.

\* \* \* \*

Q. Did you accompany him to the Medical Center of Delaware—

A. Yes, I did.

Q. —for his radiation?

A. Yes.

Q. And there was one time when you didn't go because of the ice?

A. He went, but I didn't drive him.

Q. Do you know whether you accompanied him on March 4, 1997?

A. I don't know.

Q. I'm going to show you a report dated March 4, 1997 from Viroon Donavanik.

\* \* \* \*

Q. Do you know whether you accompanied your husband on that date to the medical center?

A. I don't know.

Q. And the report, and I've highlighted it, again makes reference to his being exposed to asbestos. Do you know whether during a visit to the Medical Center of Delaware your husband ever told the doctors there that he had been exposed to asbestos?

A. I don't know.

* * * *

Q. Do you remember [the decedent] mentioning to the people at Union Hospital anything about asbestos exposure?

A. No.

Q. Now, you mentioned that you think you were present when Dr. Jesada told your husband that he had lung cancer, correct?

A. I was.

Q. Did your husband ask what caused his lung cancer?

A. No.

* * * *

Q. And you don't recall your husband ever asking Dr. Jesada, hey, what could have caused this cancer?

A. No, I don't.

Q. Did you and your husband ever discuss as between the two of you what possibly could have caused his cancer?

A. No.

* * * *

Q. When you accompanied your husband to see Dr. Suri, do you remember you or your husband ever asking Dr. Suri what may have caused his cancer?

A. Well, it was discussed.

Q. Tell me what was discussed with Dr. Suri regarding the cause of his cancer.

A. I remember her saying she had only had one other case of this type of cancer, it was a woman and she died. Now,

that's what I remember of that conversation. We were pretty much upset.

Q. Sure. Any other discussions that you can recall with Dr. Suri by either you or your husband regarding the cause of your husband's cancer?

A. No, I don't remember.

Q. When did you become aware of the name of the cancer that your husband had?

A. Well, I saw it on the death certificate and that might be when.

\* \* \* \*

Q. Did you have any discussions with any family members as to what may have caused his cancer ... any discussions as to what could have caused it?

A. No.

\* \* \* \*

Q. Did you ever, subsequent to your husband's death and prior to coming to this law firm, ever ask to see any of your husband's medical records?

A. No.

Q. Did you have in your possession prior to coming to this office any of your husband's medical records?

A. After he died, the VA Hospital, one of my neighbors worked in the X-ray department and he brought the X-rays home and said destroy them. I thought that was unusual, but I did it.

\* \* \* \*

Q. Other than those X-rays, did you ever have any other medical records relating to your husband's cancer?

A. None.

Significantly, not only is there no evidence that [the Benjamins] had express knowledge [3] of a causal connection between mesothelioma and asbestos, there is no evidence that [the Benjamins] had express knowledge that the decedent had been exposed to asbestos during his lifetime or at any time prior to 2002 [or early 2002].

Robert L. Benjamin, II, testified [at the] deposition that he had no knowledge of the connection between asbestos exposure and mesothelioma until advised by his sister at "the end of 2001, early 2002." He also testified that he knew the decedent had cancer before death but he did not know it was mesothelioma until his sister told him in late 2001. There is no evidence that Robert L. Benjamin, II had actual knowledge of the decedent's exposure to asbestos prior to late 2001.

There is no evidence that Carol Jeffers had knowledge, until late in the year of 2001, that the decedent was exposed to asbestos or that his cancerous condition was caused by such exposure. According to [the respondents], this litigation occurred after Carol Jeffers read an article in late 2001 or early 2002 about mesothelioma, told her family, and they contacted counsel.

[The Benjamins] also filed [the] affidavit [of] John E. Newhagen, Ph.D., dated December 10, 2003. . . . Dr. Newhagen opined that it would be unlikely for an average consumer to have actual knowledge of the relationship between asbestos exposure and mesothelioma prior to 1997. . . .

\* \* \* \*

We see no need to summarize the affidavit . . . because [the respondents] d[id] not argue [that before 1997] . . . [a] relationship between asbestos exposure and mesothelioma was not knowable, if a reasonable investigation had been conducted. [Mrs. Benjamin]'s sole argument [on appeal] is

---

**3.** All references herein to express or actual knowledge refers to the first prong of the discovery rule, discussed at length in this opinion. *See infra* 394 Md. at 77–78, 904 A.2d at 521–22.

that neither she, the other beneficiaries, nor the decedent had sufficient actual knowledge to place them on inquiry notice so as to charge them with the knowledge that a reasonable investigation would have revealed.

*Benjamin,* 162 Md.App. at 180–186, 873 A.2d at 467–70.

After the deposition of Mrs. Benjamin, petitioners moved for summary judgment, contending that the action was barred by limitations, and the trial court granted the motion. The court held that respondents were on inquiry notice in 1997 when Mr. Benjamin was diagnosed with mesothelioma and was aware of his exposure to asbestos. Therefore, the three-year statute of limitations period expired as to both the wrongful death and survival actions in 2000, three years after Mr. Benjamin's death. Thereafter, on appeal, the Court of Special Appeals affirmed the trial court's judgment in part and reversed in part.

## STANDARD OF REVIEW

The trial court properly grants a motion for summary judgment if the motion and the response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. Md. Rule 2–501; *Tyma v. Montgomery County,* 369 Md. 497, 504, 801 A.2d 148, 152 (2002).

If a motion for summary judgment relates to an issue involving the discovery rule and "there is any genuine dispute of material fact as to when the [claimants] possessed that degree of knowledge [of the circumstances which would cause a reasonable person in the position of the claimants to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged cause of action], the issue is one for the trier of fact to resolve." *Bank of New York v. Sheff,* 382 Md. 235, 244, 854 A.2d 1269, 1275 (2004) (citing *O'Hara v. Kovens,* 305 Md. 280, 301–02, 503 A.2d 1313, 1323–24 (1986)). Conversely, "[i]f there is no such genuine dispute ... and the question of whether the [claimants] were on inquiry notice more than three years before

their suit was filed can be determined as a matter of law, summary judgment on that issue is ... appropriate." *Id.*

▮▮▮ Further,

[i]n reviewing the grant of summary judgment, this Court must consider the facts reflected in the pleadings, depositions, answers to interrogatories and affidavits in the light most favorable to the non-moving parties, the [claimants]. Even if it appears that the relevant facts are undisputed, if those facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper. This Court has noted that the purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried.

Summary judgment unquestionably is an important device, within our court system, for streamlining litigation and ensuring the application of limited judicial resources to potentially meritorious claims. Additionally, it saves the parties expense and the delays of protracted and non-meritorious litigation. Nonetheless, dismissal of the case deprives the parties of a trial and the opportunity to develop their claims and present them to a jury. This Court has therefore been careful to restrict application of summary judgment to cases that present no material facts that may reasonably be said to be disputed.

*Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 533–34, 836 A.2d 655, 669–70 (2003) (citations omitted) (internal quotations omitted).

## THE DISCOVERY RULE

We agree with the Court of Special Appeals that the "[q]uestion in this case is when [did the Benjamins'] causes of action against the manufacturers of asbestos containing products accrue [ ]." *Benjamin*, 162 Md.App. at 191–92, 873 A.2d at 474. In order to answer that question, we begin by stating the general rule that a cause of action is said to accrue at the

time of the wrong. In *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 334, 635 A.2d 394, 399 (1994), this Court pointed out that

> [h]istorically, the general rule in Maryland was that a cause of action accrued on the date the wrong was committed. *Waldman v. Rohrbaugh*, 241 Md. 137, 139, 215 A.2d 825 (1966); *Hahn v. Claybrook*, 130 Md. 179, 182, 100 A. 83 (1917). Whether the plaintiff knew or should have known of the wrong was not considered in determining accrual. This "date of the wrong" rule did not differentiate between the plaintiff who was "blamelessly ignorant" of his potential claim and the plaintiff who had "slumbered on his rights," *Harig* [*v. Johns–Manville Products*, 284 Md. 70,] 83, 394 A.2d 299, [306 (1978)]. It wrought harsh consequences in cases where plaintiffs' claims were barred, not only before they were able to perceive any harm, but before it was possible for them to learn that the negligence had taken place, such as in situations involving professional services where the plaintiff was not qualified to ascertain the injury. *Waldman, supra*, 241 Md. at 140, 215 A.2d 825, quoting *Developments in the Law, Statute of Limitations*, 63 Harv. L.Rev. 1177, 1201 (1950).

In the absence of any statutory provision to the contrary, because of the "unfairness inherent in charging a plaintiff with slumbering on rights not reasonably possible to ascertain, this Court adopted what is known as the discovery rule, which now applies generally in all civil actions, and which provides that a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong." *Id.* (citation omitted).

■■■ Our first recognition of the discovery rule was in the early 1900s in a medical malpractice case. *Hahn*, 130 Md. at 187, 100 A. at 86 (recognizing that the cause of action, although barred in that case, did not accrue until an injury was discoverable). *See Harig*, 284 Md. at 83, 394 A.2d at 306 ("In situations involving the latent development of disease, a plaintiff's cause of action accrues [under the discovery rule] when he ascertains, or through the exercise of reasonable care and

diligence should have ascertained, the nature and cause of his injury."). Thus, the discovery rule was adopted to resolve unfairness and injustice. *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). The rule

> requires that the plaintiff must have notice of a claim to start the running of limitations. We defined such notice in *Poffenberger* as "express cognition or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.' " 290 Md. [631], 637, 431 A.2d 677[, 681 (1981) ].

*Hecht,* 333 Md. at 336, 635 A.2d at 400 (citations omitted) (alterations in original).

The discovery rule has been extended to cases of "latent development of disease" because

> [l]ike the victim of undiscoverable malpractice a person incurring disease years after exposure cannot have known of the existence of the tort until some injury manifests itself. In neither case can the tort victim be charged with slumbering on his rights, for there was no notice of the existence of a cause of action. This feature distinguishes these situations from ordinary tort cases, which require no exception to the general rule that knowledge of the wrong is immaterial, because usually some harm will be apparent to a reasonably diligent plaintiff.

*Harig,* 284 Md. at 80, 394 A.2d at 305 (citations omitted). Those who suffer injury due to occupational disease or their beneficiaries "may, in appropriate circumstances, be 'blamelessly ignorant' of the fact that a tort has occurred and thus, ought not be charged with slumbering on rights they were unable to ascertain." *Id.* at 83, 394 A.2d at 306.

## ANALYSIS

## WRONGFUL DEATH ACTION[4]

██ Petitioners argue that under § 3–904(g)(2)(ii) of the wrongful death statute, the three-year limitations period is triggered when death is discovered and not when the claimant discovers that the underlying cause of decedent's death was an occupational disease, i.e., asbestos exposure. *See infra* 394 Md. at 81–82, 904 A.2d at 524. The petitioners maintain that the triggering event was ultimately Mr. Benjamin's death. Further, they contend that it is immaterial that the Benjamins did not become aware, until 2001, that prior asbestos exposure caused the mesothelioma. The premise for this argument is that Mr. Benjamin died in 1997 as a result of cancer, and his death was the event that triggered the running of the limitations period.

In addition, UC maintains that in *Waddell v. Kirkpatrick,* 331 Md. 52, 57, 626 A.2d 353, 355 (1993), this Court held that under the wrongful death statute an action commences on the date of the injured person's death. Therefore, the discovery rule does not apply.[5] Alternatively, UC argues that even if the

---

**4.** It is important to note that wrongful death and survival actions are independent; "separate and distinct causes ... with two separate and distinct claimants. Thus, disposing of one does not automatically act as a bar to the other." *Benjamin,* 162 Md.App. at 205, 873 A.2d at 481. *See Globe American Cas. Co. v. Chung,* 76 Md.App. 524, 526–27, 547 A.2d 654, 654–55 (1988), *vacated on other grounds,* 322 Md. 713, 589 A.2d 956 (1991)).

**5.** UC also relies on *Trimper v. Porter–Hayden,* 305 Md. 31, 501 A.2d 446 (1985). Its reliance is misplaced. In *Trimper,* two widows filed wrongful death and survival actions, more than three years after their husbands' deaths, alleging that their husbands died as a result of asbestos exposure. *Id.* at 32–33, 501 A.2d at 447–48. In that case, we acknowledged that wrongful death claims are governed by § 3–904(g). In that regard, we refused to extend the application of the discovery rule to wrongful death actions because the legislature created the cause of action and imposed a time limit, "within three years after the decedent's death," for filing a wrongful death action. *Id* at 35–36, 501 A.2d at 449. The next year the Legislature revised the wrongful death statute by adding a new subsection § 3–904(g)(2). Section 3–904(g)(2)(ii) provides:

discovery rule applies, the family was on notice when Mr. Benjamin died of mesothelioma in 1997, and should have investigated further at that time.

The Benjamins assert that the Court of Special Appeals did not err when it held that there was no evidence in the record that the beneficiaries had any express knowledge, prior to late 2001, that Mr. Benjamin's death was linked to an occupational disease. Therefore, because summary judgment was inappropriate, their claims, although filed more than three years after Mr. Benjamin's death, should not be time barred. In addition, we note that a question of whether the beneficiaries had any knowledge as to the nature of the mesothelioma, other than that it was a form of cancer, is a question for the trier of fact and not for the court to decide on summary judgment.

The trial court held that the Benjamins were on notice when Mr. Benjamin was diagnosed with mesothelioma. Further, the trial court found that the Benjamins were aware of Mr. Benjamin's exposure to asbestos when he relayed that information to his doctors during the course of his medical diagnosis and treatment. The only reference, however, to the family's alleged communication with Mr. Benjamin's doctors was contained in a footnote in the trial court's memorandum opinion which indicated that Mrs. Benjamin accompanied her husband on doctor and hospital visits. Neither the son nor the daughter were mentioned in the opinion. Additionally, Mrs. Benjamin testified that either she was never told or did not recall any discussions with the doctors about Mr. Benjamin's previous asbestos exposure or the link between the mesothelioma and that exposure.

---

(ii) If an occupational disease was the cause of a person's death, an action shall be filed:

 (1) Within 10 years of the time of death; or

 (2) Within 3 years of the date when the cause of death was discovered, whichever is the shorter.

Thus, it is clear that the 1986 statutory changes to § 3–904(g) partially abrogated our holding in *Trimper* to the extent that the wrongful death statute no longer precludes us from applying the discovery rule to a wrongful death occupational disease-related claim filed more than three years after the decedent's death.

The intermediate appellate court held that in a wrongful death action, "[i]f the decedent does not have knowledge sufficient to satisfy the discovery rule, the [beneficiaries are] the determinative part[ies].... [T]he cause of action does not accrue until the beneficiaries are on inquiry notice." *Benjamin,* 162 Md.App. at 201, 873 A.2d at 479. The Court of Special Appeals held that the fact that Mrs. Benjamin accompanied her husband to appointments was not sufficient evidence to show that she was on inquiry notice as a matter of law. *Id.* at 205, 873 A.2d at 481–82. Further, the evidence was insufficient to show that the respondents were on inquiry notice regarding the asbestos exposure, although they were aware of the mesothelioma. *Id.* The intermediate appellate court held that "[t]he direct evidence of express knowledge in the case before us is that [Mrs. Benjamin] and the other beneficiaries knew only that the cause of death was mesothelioma, prior to late 2001[, and] ... the non-moving party ... gets the benefit of all reasonable inferences." *Id.*

 A wrongful death action is designed to compensate the family of a decedent who died due to the "wrongful act,[6] neglect, or default on another person." [7] *Binnix v. Johns–Manville Products Corp.,* 593 F.Supp. 1180, 1182 (D.Md.1984)

---

6. Pursuant to Md.Code (1974, 2002 Repl.Vol.), § 3–901(e) of the Courts and Judicial Proceedings Article, a "wrongful act" is defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." We interpret this section to mean that there must have been a wrongful act in order for a beneficiary to bring an action for wrongful death.

7. A wrongful death action is "brought by relatives of the victim and seek[s] recovery for their loss by virtue of the victim's death.... [The action arises] only [by] the actual death of the victim." *Benjamin,* 162 Md.App. at 202, 873 A.2d at 480 (citations omitted); BLACK'S LAW DICTIONARY 1644 (8th ed. 2004) (A wrongful death action is defined as "[a] lawsuit brought on behalf of a decedent's survivors for their damages resulting from a tortious injury that caused the decedent's death."). *See also Owens-Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 534, 682 A.2d 1143, 1159–60 (1996) (noting that the claimants under a wrongful death action are limited to a specific class of beneficiaries).

(quoting *Stewart v. United Electric Light and Power Co.*, 104 Md. 332, 343, 65 A. 49, 53 (1906)). See also *Eagan v. Calhoun*, 347 Md. 72, 82, 698 A.2d 1097, 1102 (1997).

There are two relevant inquiries necessary to determine the commencement date for a cause of action for wrongful death under § 3–904(g): (1) did the cause of action commence at the time of the decedent's death; or (2) did the cause of action commence when the beneficiaries became aware of the causal link between the decedent's illness and his exposure to a toxic substance? In answering these questions and determining when the cause of action arose, we must interpret the language of the wrongful death statute. Md.Code (1974, 2002 Repl.Vol.), § 3–904(g) of the Courts and Judicial Proceedings Article.

We stated in *Walton v. Mariner Health*, 391 Md. 643, 664, 894 A.2d 584, 596 (2006) that:

The cardinal rule of statutory interpretation is to ascertain and effectuate legislative intent. *O'Connor v. Baltimore County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004); *Privette v. State*, 320 Md. 738, 744, 580 A.2d 188, 191 (1990) (citations omitted). We may consider the general purpose and aim of a statute in an effort to discern legislative intent. *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987). Our long-standing rule is that if the language used in the statute is clear, unambiguous, and consistent with its objective, the words will be accorded their ordinary meaning. *Ayres v. Townsend*, 324 Md. 666, 672, 598 A.2d 470, 473 (1991) (citations omitted); *see G. Heileman Brewing Co., Inc. v. Stroh Brewery Co.*, 308 Md. 746, 755, 521 A.2d 1225, 1230 (1987).

In contrast, if the statutory language is ambiguous, we have maintained, that

[i]n determining the meaning of a statute, we consider the statute's structure, including the title, and how the statute relates to other laws. *Witte v. Azarian*, 369 Md. 518, 525–26, 801 A.2d 160, 165 (2002). We look first to the plain meaning of the language chosen by the Legislature. If the

plain language of the statute is ambiguous, we analyze the case law, legislative history, and statutory function. *Comptroller v. Phillips*, 384 Md. 583, 591, 865 A.2d 590, 594 (2005) (citing *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004)).

*Stouffer v. Pearson*, 390 Md. 36, 46–7, 887 A.2d 623, 629 (2005).

■ We may review the relationship of new amendments to any earlier statutory language and other materials to ascertain legislative purpose or goal. *Wynn v. State*, 313 Md. 533, 539, 546 A.2d 465, 468 (1988).

■ In an attempt to determine legislative intent, it is well settled that preambles to a statute may be considered. *McAlear v. McAlear*, 298 Md. 320, 343, 469 A.2d 1256, 1268 (1984) (noting that a preamble to a statute may be considered in determining legislative intent). *See Dillon v. State*, 277 Md. 571, 583, 357 A.2d 360, 367–68 (1976) ("The recitals set forth by the legislature in a preamble may be resorted to as an aid in construction of a statute.") (abrogated on other grounds by *Barnhard v. State*, 325 Md. 602, 602 A.2d 701 (1992)). *But see Comptroller of the Treasury v. Glenn L Martin Co.*, 216 Md. 235, 249, 140 A.2d 288, 295 (1958) ("Preambles are not operative parts of the statute."); *Gibson v. State*, 204 Md. 423, 432, 104 A.2d 800, 805 (1954).

Before the 1986 revision, the wrongful death statute required that a wrongful death action must "be filed within three years after the death of the injured person." Md.Code (1974, 1984 Repl.Vol.), § 3–904(g) of the Courts and Judicial Proceedings Article.

In May 1986, the General Assembly of Maryland, by way of Senate Bill 864, approved a revision to § 3–904(g) of the Courts and Judicial Proceedings Article. The statute, as revised, provides:

§ 3–904 Action for wrongful death.

(g) *Action to commence within three years; deaths caused by occupational disease.*—(1) Except as provided

in paragraph (2) of this subsection, an action under this subtitle shall be filed within three years after the death of the injured person.

(2) (i) In this paragraph "occupational disease" means a disease caused by exposure to any toxic substance in the person's workplace and contracted by a person in the course of the person's employment.

(ii) If an occupational disease was the cause of a person's death, an action shall be filed:

(1) Within 10 years of the time of death; [8] or

(2) Within 3 years of the date when the cause of death was discovered, whichever is the shorter.

Md.Code (1974, 2002 Repl.Vol.), § 3–904(g) of the Courts and Judicial Proceedings Article. *See also* 1986 Md. Laws, Chap. 374. Before we determine whether the discovery rule applies, we must first determine whether 3–904(g)(2) is a condition precedent to maintaining a cause of action or a statute of limitations, *per se.*

## Condition Precedent or Statute of Limitations

Historically, we have construed the limitation period prescribed in § 3–904(g) as a condition precedent to maintaining a cause of action, rather than as a statute of limitations. *See Waddell, supra,* 331 Md. at 57, 626 A.2d at 355 (cases cited therein). In *Waddell,* we held that the limitations period prescribed in § 3–904(g) is a condition precedent to maintaining a cause of action. *Id.* In *Waddell,* an adult filed a wrongful death action approximately seventeen years after her father died from injuries sustained when his car collided with a tractor trailer. *Id.* at 54, 626 A.2d at 354. At the time of her father's death, the daughter was a minor. *Id.* The defendants moved to dismiss the wrongful death claim because it was filed more than three years after the decedent's death.

---

8. The original 1986 language of § 3–904(g)(2)(ii)(1) was "[w]ithin 5 years of the time of death...." 1986 Md. Laws, Chap. 374. In 1987, however, the Legislature further amended Sec. 3–904(g)(2)(ii)(1) to its current form and language. 1987 Md. Laws, Chap. 629.

The trial court granted the motion to dismiss. *Id.* On appeal the daughter argued, among other things, that the 1971 changes to § 3–904(g)(1), amending the statute from a two year limitations period to three years, changed the time period of the statute from a condition precedent to a statute of limitations. We disagreed and explained:

In [*State v. Parks*, 148 Md. 477, 129 A. 793 (1925),] the issue was whether the requirement in the wrongful death statute then in effect, Maryland Code (1912) Art. 67 § 2, requiring "that every such action shall be commenced within twelve calendar months after the death of the deceased person," is "a condition essential to the right to maintain the action given by the statute, or merely a limitation of the remedy which must be pleaded to defeat the action."

*Id.* at 58, 626 A.2d at 356 (quoting *Parks*, 148 Md. 477–78, 129 A. at 793 (noting that in 1925, a claimant had twelve months to bring a wrongful death action—today, a claimant has ten years, or three years from the date cause of death is discovered)).

Further, we explained that the wrongful death

[statute] create[s] a new legal liability, with the right to suit for its enforcement, provided the suit is brought within [the statutory time prescribed], and not otherwise. The time within which the suit must be brought operates as a limitation of the liability itself as created, and not of the remedy alone. It is a condition attached to the right to sue at all. . . . Time has been made of the essence of the right and the right is lost if the time is disregarded. The liability and the remedy are created by the same statutes, and the limitations of the remedy are, therefore, to be treated as limitations of the right.

*Id.* at 59, 626 A.2d at 356 (alterations in original) (alterations added).

In 1985, in *Trimper*, we held that the unambiguous language of the wrongful death statute leaves "no room for judicial interpretation ... of the discovery rule." *Trimper*, *supra* at n. 7 at 17, 305 Md. at 36, 501 A.2d at 449. The three-

year period after the date of death for filing a wrongful death claim stood as an objectively determinable event or starting point. *Id.* at 34, 501 A.2d at 448. In addition, the wrongful death statute "created a new liability not existing at common law.... The period of limitations is part of the substantive right of action." *Id.* at 35, 501 A.2d at 449 (citations omitted). Further, this Court has held that

[a] condition precedent cannot be waived under the common law and a failure to satisfy it can be raised at any time because the action itself is fatally flawed if the condition is not satisfied. This requirement of strict or substantial compliance with a condition precedent is of course subject to abrogation by the General Assembly.

*Rios v. Montgomery County,* 386 Md. 104, 127–28, 872 A.2d 1, 14 (2005).

 The statute of limitations, however, is different.[9] Judge Cole writing for this Court in *Pennwalt* stated:

Statutes of limitations have existed in Maryland and in other common law jurisdictions for hundreds of years. *See* Ferguson, *The Statutes of Limitation Saving Statutes,* 12–14 (1978). The statutes were enacted in an effort to balance the competing interests of potential plaintiffs, potential defendants, and the public. The statutory period provided by a statute of limitations represents a compromise of these interests and "reflects a policy decision regarding what constitutes an adequate period of time for a person of ordinary diligence to pursue his claim." *Goldstein v. Potomac Electric Power Co.,* 285 Md. 673, 684, 404 A.2d 1064, 1069 (1979). By creating a limitations period, the legislature determined that a plaintiff should have only so long to bring his action before he is deemed to have waived his

---

9. Maryland's general statute of limitations is applicable to most civil actions and provides:

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

Md.Code (1974, 2002 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article.

right to sue and to have acquiesced in the defendant's wrongdoing. Limitations statutes therefore are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy. *Pierce,* 296 Md. at 665, 464 A.2d at 1026.

*Pennwalt,* 314 Md. at 437–38, 550 A.2d at 1157–58. *See State v. Sharafeldin,* 382 Md. 129, 140–41, 854 A.2d 1208, 1214 (2004). Further, "in contrast [to a condition precedent to maintaining an action], a statute of limitations affects only the remedy, not the cause of action." *Waddell,* 331 Md. at 59, 626 A.2d at 353. The defense of limitations may be waived; however, a condition precedent to liability may not be waived. *Rios,* 386 Md. at 127–28, 872 A.2d at 14.

We must determine the legislative intent of the phrase "statute of limitations" in the 1986 revisions to § 3–904(g). The Legislature stated that before 1986, under the wrongful death statute, occupational disease involved "latent or dormant" phases that may be undiscoverable beyond "the 3–year *statute of limitations.*" Senate Judicial Proceedings Committee, Summary of Committee Report, S.B. 864 at 1 (Md.1986) (emphasis added). The legislative purpose of the revisions was that the "*statute of limitations* [would start to run] . . . [from] the discovery of facts from which it becomes known or reasonably should become known that the occupational disease was a cause of death." *Id.* at 2. Unfortunately, the General Assembly did not define the phrase "statute of limitations" before or after its revisions, however it acknowledged that the wrongful death statute "runs from the date [of death]. . . ." *Id.* at 2. No outward declaration was made that § 5–101 would apply to the wrongful death statute, thus we presume that the Legislature meant that the limitations period provided within § 3–904(g)(2) would apply. *See supra* at note 11.

We were faced with the same issue in 1971, when the Legislature changed the time period to bring a wrongful death action from two years to three years, and used the phrase "statute of limitations" in the preamble. *Waddell,* 331 Md. at

61, 626 A.2d at 357; 1971 Md. Laws, Chap. 784. Judge Bell (now Chief Judge), writing for the Court in *Waddell,* concluded that

> although [the Legislature] referred to that time period as a statute of limitations in the process, that does not suffice to effect so considerable a change to render what had once been a condition precedent a statute of limitations. Had the Legislature intended such a radical change, it easily could have done so; it certainly knew how to do it.

*Id.; Geisz v. Greater Baltimore,* 313 Md. 301, 322, 545 A.2d 658, 668 (1988) (" 'Even a change in the phraseology of a statute by codification will not ordinarily modify the law unless the change is so material that the intention of the General Assembly to modify the law appears unmistakably from the language of the Code.' ") (quoting *Rohrbaugh v. Estate of Stern,* 305 Md. 443, 449, 505 A.2d 113, 116 (1986)).

In *Waddell,* the Court explained that "the time period prescribed in § 3–904(g) has been construed by this Court to be a condition precedent to maintaining the action, rather than a statute of limitations." *Id.* The Court in *Waddell* interpreted the limitations period contained in subsection (g) as condition precedent to maintaining a cause of action. It also noted that the Legislature created a different time period in which to bring a wrongful death claim for deaths caused by occupational disease:

> Prior to 1986, subsection (g) provided only one time period in which to bring a wrongful death action. In that year, the Legislature amended that subsection to include what is now paragraph (2), *providing a different time period* in which to bring a wrongful death action when the death is alleged to have been caused by occupational disease.

*Id.* at 63, 626 A.2d at 357 (emphasis added) (citation omitted).

 No sound reason has been advanced for us to now change our prior interpretation of § 3–904(g)(2). The limitations period prescribed in § 3–904(g)(2) is a condition precedent to maintaining a cause of action when death is alleged to have been caused by occupational disease. The limitations

period prescribed in § 3–904(g), providing that an action "shall be filed within three years after the death of the injured person," is similarly a condition precedent to maintaining a cause of action for wrongful death in all other cases. Further, we hold that because the Legislature, pursuant to § 3–904(g), provided a different time period for the commencement of a wrongful death action, the general statute of limitations specified in § 5–101 does not apply. Our holdings herein are consistent with our observations in *Waddell.* Aside from our conclusion that the limitations period prescribed by this statute is a condition precedent to maintaining a cause of action, our construction of § 3–904(g)(2) alone, pursuant to the rules of statutory interpretation, is consistent with the notion that the Legislature intended to "incorporate[ ] the discovery rule as judicially developed." *Benjamin,* 162 Md.App. at 197–98, 873 A.2d at 477.

## Interpretation of § 3–904(g)(2)

Most of the language in § 3–904(g) is not at issue. There is no dispute as to the plain meaning of subsection (g)(1) that a wrongful death action must be filed "three years after the death of the injured person[ ]" unless a claimant falls under an exception provided under subsection (g)(2) of the statute. The provisions in section 3–904(g)(1) are a condition precedent to bringing a cause of action. The language of (g)(1) provides that an exception to the general rule exists. Before the 1986 revision, however, no exception was provided.

Subsection (2)(I) defines "occupational disease" as "a disease caused by exposure to any toxic substance in the person's workplace and contracted by a person in the course of the person's employment." Subsection (g)(2)(ii) provides that "if an occupational disease was the cause of a person's death" a wrongful death action shall be filed "1. [w]ithin 10 years of the time of death; or 2. [w]ithin 3 years of the date when the cause of death was discovered, whichever is shorter. The Legislature set a mandatory ceiling on how long a claimant has to file a wrongful death action. If a claimant discovers, ten years and four months after death, that the injured

person's death was ultimately caused by asbestos exposure, the claimant is barred from bringing an action under the statute.

Subsection (2)(ii)(2) does not specify the meaning of the phrase "when the cause of death was discovered." The drafters provided no definition in either the statute itself, or within the Subtitle, for the phrase "cause of death."[10] *See* Md.Code (1974, 2002 Repl.Vol.), § 3–901 of the Courts and Judicial Proceedings. *See* Title 3, Subtitle 9 of the Courts and Judicial Proceedings. In Mr. Benjamin's case, the term "cause of death" could mean mesothelioma, as indicated in the death certificate; or the term could mean, exposure to asbestos which caused or contributed to the mesothelioma. The term "cause of death" is therefore ambiguous. Notwithstanding the ambiguity within the statute itself, we have had occasion to interpret the word "discovered" as used in other limitations statutes.

The ordinary meaning of the word "discovered," or in the present tense "discover," is "to make known (something secret, hidden, unknown, or previously unnoticed). Webster's Third New International Dictionary 647 (2002). In *Piselli v. 75th Street Medical*, 371 Md. 188, 193–94, 808 A.2d 508, 510–11 (2002), the United States Court of Appeals for the Fourth Circuit presented to this Court a certified question as to whether the word "discovered" within the meaning of the medical malpractice statute of limitations incorporated the discovery rule. The language of the statute provided, in relevant part:

> (a) *Limitations.*—An action for damages for injury arising out of the rendering of or failure to render professional services by a health care provider . . . shall be filed within. . . .

---

**10.** The petitioners argue that the plain language of the statute states that the cause of death in this case is mesothelioma, and as such, one does not have to look further for a definition. To the contrary, the Benjamins contend that the plain language of the statute means that the latent cause of death was asbestos exposure. As a result, they were not on notice as to the link between mesothelioma and the asbestos exposure until 2001.

\* \* \* \*

(2) Three years of the date the injury was *discovered.*

Md.Code (1974, 1998 Repl.Vol.), § 5–109(a)(2) of the Courts and Judicial Proceedings Article (emphasis added).

 In construing the term "discovered," we held that the "unambiguous language of § 5–109(a)(2) does embody the traditional Maryland 'discovery rule'...." *Piselli,* 371 Md. at 203, 808 A.2d at 517. Application of the discovery rule involves a two-prong test. The first prong, "sufficiency of the actual knowledge to put the claimant on inquiry notice," concerns the nature and extent of actual knowledge necessary to cause an ordinarily diligent plaintiff to make an inquiry or investigation that an injury has been sustained. *Benjamin,* 162 Md.App. at 193–94, 873 A.2d at 475. *See O'Hara,* 305 Md. at 302, 503 A.2d at 1324; *Pennwalt v. Nasios,* 314 Md. 433, 453, 550 A.2d 1155, 1165–66 (noting that a plaintiff must have notice of the nature and cause of his or her injury). For inquiry notice, a person must have actual notice, either express or implied. Express knowledge is direct, whether written or oral, from sources "cognizant of the fact[s]." *Poffenberger,* 290 Md. at 636–37, 431 A.2d at 681 (citation omitted). Implied notice occurs "when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further." *Pennwalt,* 314 Md. at 447, 550 A.2d at 1163. Constructive notice or knowledge will not suffice for inquiry notice. *See Poffenberger,* 290 Md. at 637, 431 A.2d at 681.

In *Pennwalt,* we discussed that actual notice was necessary to satisfy the first prong of the discovery rule:

We stated in *Poffenberger* that a "cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." The defendant conceded that the plaintiff did not have express knowledge of the wrong ... but instead argued that the plaintiff should have known of the wrong at th[e] time [of the injury]. In particular, the defendant argued that the plaintiff had constructive knowledge of the defendant's breach and negligence.... We rejected this argument holding that constructive notice is

insufficient to give a plaintiff knowledge of the wrong. Instead, we ruled that actual knowledge, either express or implied, is necessary. We defined implied actual knowledge as that knowledge that would in all probability have resulted from a reasonably diligent investigation pursued upon awareness of circumstances that would cause a reasonable person to investigate. We remanded the case to the trial court in order to resolve a factual dispute regarding whether ... the plaintiff possessed knowledge from which actual notice could be inferred. In other words, it was debatable whether the plaintiff had knowledge of sufficient facts to cause a reasonable person to investigate further. In sum, *Poffenberger* extended the ameliorative effects of the discovery rule ... and set the stage for future discussions regarding the function of implied knowledge in relation to the workings of the discovery rule.

314 Md. at 442–43, 550 A.2d at 1160 (citation omitted) (alterations added).

 The second prong, "the sufficiency of the knowledge that would have resulted from a reasonable investigation," requires that after a reasonable investigation of facts, a reasonably diligent inquiry would have disclosed whether there is a causal connection between the injury and the wrongdoing.[11] *Benjamin,* 162 Md.App. at 193, 873 A.2d at 475; *O'Hara,* 305 Md. at 302, 503 A.2d at 1324. *See Pennwalt,* 314 Md. at 452, 550 A.2d at 1165; *Baysinger v. Schmid,* 307 Md. 361, 367–68, 514 A.2d 1, 4 (1986). The requirement for inquiry notice is that if a person investigates diligently, the causal connection would be revealed. *In Re Klein Moffett Co.,* 28 F.2d 523, 525 (D.Md.1928) ("[N]otice of facts which would incite a person of reasonable prudence to inquire is notice of all facts which reasonably diligent inquiry would develop.").

---

11. The issue of whether the second prong of the discovery rule was satisfied, *sub judice,* was not raised on appeal in the Court of Special Appeals. Other than a preliminary introduction, the issue will not be discussed in this opinion.

In *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 444, 749 A.2d 796, 803 (2000), this Court applied the discovery rule to a real property statute. The statute, in pertinent part, provided:

> (d) *Limitations of actions.*—Any action arising under this subtitle shall be commenced within two years after the defect was *discovered or should have been discovered* . . . .

Md.Code (1974, 1996 Repl.Vol., 1999 Cum.Supp.), § 10–204(b)(3)(d) of the Real Property Article (emphasis added). The Court in *Lumsden* interpreted the term "discovered" to mean that the cause of action accrued upon discovery of the wrong. *Id.* at 441, 749 A.2d at 799 ("Section 10–204(d) mandates that the period for a cause of action under this subtitle commences when the cause of action was discovered or should have been discovered.").

In the present case, petitioners contend that because the word "accrue" was omitted from § 3–904(g)(2)(ii)(2), and from the survival statute § 5–113(b), the discovery rule does not apply to either statute. In answering this contention, we find the analysis of the Court of Special Appeals in this case most persuasive. The intermediate appellate court explained:

> In 1987, the 5–year period that was in the original enactment was changed to the current 10 years. Also in 1987, the legislature enacted section 5–113. . . . In 1988, the enactment was amended to add § (c), defining proximate cause. While the language in the two limitations/repose provisions is not the same, *i.e.*, section 5–113(b) provides that a claim has to be "filed within 3 years of the discovery of facts from which it was *known or reasonably should have been known* that an occupational disease was the proximate cause of death," and section 3–904(g)(2)(ii)(2) provides that a claim has to be filed "[w]ithin 3 years of the date when the cause of death *was discovered*," we conclude that, in each instance, the legislature incorporated the discovery rule as judicially developed.

*Benjamin*, 162 Md.App. at 197–98, 873 A.2d at 477 (citations omitted). We agree.

In our view, the Legislature incorporated the discovery rule into the wrongful death statute, § 3–904(g)(2), by using the phrase "when the cause of death was discovered." This implies that the person maintaining a claim for wrongful death has a duty to discover the wrongful act (asbestos exposure) and the antecedent disease leading to the decedent's death (mesothelioma). This interpretation of the statute is consistent with the notion that the prescribed limitations period will commence when the claimants (beneficiaries) obtain knowledge of the injury and the cause of that injury which resulted in the decedent's death.

Further, our investigation of the legislative intent reveals that the 1986 preamble to Senate Bill 864, now codified as § 3–904(g)(2)(ii), states that "[a]s a matter of fundamental fairness, a cause of action should not be deemed to have accrued until the date that knowledge of the wrong upon which the action is based is discovered or should be discovered." Ch. 374 of the Laws Maryland 1986. Consistent with our interpretation of the statute in *Waddell*, we review the language contained in the preamble and conclude that the Legislature intended that an occupational disease-related wrongful death action accrues when "knowledge of the wrong upon which the action is based is discovered or should be discovered." *Waddell*, 331 Md. at 62, 626 A.2d at 358.

The legislative intent is further clarified in the Senate committee report, which states that:

Under this bill, the statute of limitations would not begin to run until facts are discovered from which it becomes known or should become known that the occupational disease was the cause of death....

\* \* \* \*

The [legislative] intent of this bill is to provide that the 3-year statute of limitations in a wrongful death action for a death caused by an occupational disease does not begin to run until the discovery of facts from which it becomes

known or reasonably should become known that the occupational disease was the cause of death.

Senate Judicial Proceedings Committee, Summary of Committee Report, S.B. 864 at 1–2 (Md.1986).

Further, the Senate Bill Analysis stated that the amendment, "[r]equires that a wrongful death action be filed within 3 years after the death of the injured person or the date the dependents know or should have known of the wrongful act, whichever date is later." Senate Judicial Proceedings Committee, Bill Analysis, S.B. 864 at 1 (Md.1986).

The Legislature intended that the discovery rule apply to § 3–904(g)(2), in cases of wrongful death caused by occupational disease, as indicated in the language of the preamble, the bill analysis, and the committee report. Finally, we review the decisions of other jurisdictions that have determined that the discovery rule applies to wrongful death statutes on the theory that the injury was discovered after the expiration of the limitations period.

The federal district court questioned whether the discovery rule applied to the Illinois wrongful death statute, which provided that an action "shall be commenced within two years after the death." In the *Johns–Manville Asbestosis Cases,* 511 F.Supp. 1235, 1236 (1981). The longstanding rule in Illinois was that the limitations period prescribed in the wrongful death statute constituted a condition precedent, thus was a

"condition of liability, and operate[d] as a limitation of the liability itself, and not the remedy alone." They are grounded on the fact that the wrongful death action is considered "wholly statutory"—a cause of action created by the General Assembly where none existed at common law. So the time period specified in [the wrongful death statute] is considered "a condition attached to the right to sue and . . . not merely a statute of limitations."

*Id.* (citations omitted) (alterations added).

In *Johns–Manville,* several plaintiffs filed wrongful death actions seeking damages after the two-year limitations period

had run, and argued that the discovery rule should apply because the injury was discovered after the limitations period. *Id.* The defendants asserted that application of the discovery rule would be at odds with the statutory directive and the statute should be strictly construed. *Id.* at 1237. The court in *Johns–Manville* discussed several cases, including two Illinois wrongful death cases in which the discovery rule was applied after the two-year limitations period had expired. *Id.* See *Fure v. Sherman Hospital,* 64 Ill.App.3d 259, 21 Ill.Dec. 50, 380 N.E.2d 1376, 1385 (1978) (holding that the discovery rule should not be barred for wrongful death, if allowed for "mere wounding or injury"); *Praznik v. Sport Aero, Inc.,* 42 Ill.App.3d 330, 355 N.E.2d 686, 690 (1976) ("While a wrongful death action is a right created by statute, and ... may not be ignored, we are not convinced that in all cases the two-year period must begin to run at the moment of death...."). The Court in *Johns–Manville* considered the latent disease factor and held that

> "[w]e are of the opinion that in a case such as this, where the injury occurred over a long period of time and not as a result of one sudden traumatic event, the preferred rule is that the cause of action accrues when the plaintiff knows or should know of an injury and that injury was probably caused by the wrongful acts of another."

*Id.* at 1238 (citation omitted); *Eisenmann v. Cantor,* 567 F.Supp. 1347, 1354 (1983) (holding that although the Illinois wrongful death statute was a condition precedent to liability, the discovery rule applied); *White v. Johns–Manville,* 103 Wash.2d 344, 693 P.2d 687, 693 (1985) (*en banc* ) (holding, in a case involving mesothelioma, asbestos exposure, a condition precedent to the wrongful death statute and the discovery rule, that the "wrongful death action 'accrues' at the time the decedent's personal representative discovered or should have discovered the cause of action").

Accordingly, we hold that a person bringing a wrongful death action under § 3–904(g)(2) has ten years from the time of the decedent's death to bring an action, or three years from the time the claimant(s) discover or should have discovered

that an "occupational disease" contributed to or caused the decedent's death.

 Further, sufficient evidence existed to generate a genuine dispute as to the material facts. The evidence submitted was that Mrs. Benjamin, Carol Jeffers, and Robert Benjamin, III, were on inquiry notice for the first time in 2001 when Carol Jeffers discovered the connection between asbestos exposure and mesothelioma. Mrs. Benjamin's knowledge of her husband's cancer diagnosis and the asbestos exposure are matters in dispute and are not subject to resolution by summary judgment. Thus, we affirm the Court of Special Appeals' holding that the trial court erred when it granted the petitioner's motion for summary judgment on the wrongful death action.

## SURVIVAL ACTION

Mrs. Benjamin, personal representative on behalf of the Estate of Robert L. Benjamin, Sr., contends that the intermediate appellate court erred when it held that sufficient evidence existed to imply that Mr. Benjamin was on inquiry notice. According to Mrs. Benjamin, simply because Mr. Benjamin discussed his previous asbestos exposure with his physicians and he had express knowledge of the mesothelioma, does not equate to notice sufficient for a reasonable person to conduct an investigation to find a link between asbestos exposure and mesothelioma. Mrs. Benjamin maintains that the decedent did not have actual notice that the mesothelioma was caused by his exposure to asbestos. Therefore, she concludes that the first prong of the discovery rule was not satisfied.

The trial court determined that evidence in Mr. Benjamin's medical report indicated specific examples and several references to asbestos exposure and the diagnosis of mesothelioma. The trial judge found that the evidence was sufficient to put Mr. Benjamin on inquiry notice, and held that

> [w]hen a patient volunteers information about his condition there can be no explanation other than he believes it is significant. The proffered facts may or may not be relevant

to the patient[']s disease—but he has a duty to investigate. He cannot raise the issue then ignore it.

The Court of Special Appeals reviewed the trial court's finding regarding the survival action and held that Mr. Benjamin had express knowledge of his mesothelioma and asbestos exposure, and the evidence was sufficient for the trial court to find that the decedent was on inquiry notice prior to his death in 1997.[12] *Benjamin,* 162 Md.App. at 205, 873 A.2d at 481. The court held that a reasonable person would have investigated and discovered a causal connection between mesothelioma and asbestos exposure by the state of general knowledge of occupational diseases and asbestos exposure at the time. *See id.*

Under the survival statute, if an occupational disease was the proximate cause of a claimant's death, damages can be claimed "within three years from the date" the action accrues "but not later than 10 years from the date of death." Md. Code (1974, 2002 Repl.Vol.), § 5–113 of the Courts and Judicial Proceedings. Maryland has applied both the discovery rule and the statute of limitations to survival claims for close to a century. *See Geisz, supra,* 313 Md. at 306, 545 A.2d at 660 (and cases cited therein). *See Trimper, supra,* 305 Md. at

---

12. The Court of Special Appeals also addressed the issue of whether the survival suit could be brought by Mrs. Benjamin in 2001, since Mr. Benjamin died in 1997. *Benjamin,* 162 Md.App. at 190–91, 873 A.2d at 473. "[Mr. Benjamin] discovered his cause of action in early 1997 and died in May of the same year." *Id.* Thus, at the time of decedent's death, the statute of limitations had not yet run on his claim. *Id.* Mrs. Benjamin, as personal representative, brought the decedent's action for personal injuries when she discovered the causal connection between asbestos exposure and mesothelioma, more than three years after her husband's death. *Id.* If Mr. Benjamin had lived, the last date on which he could have brought a claim against the defendants for personal injuries relating to his occupational disease would have been early 2000. Accordingly, we agree with the intermediate appellate court that Mr. Benjamin's survival action accrued before his death, "because the claim [arose] out of personal injuries sustained by the decedent during his lifetime." *Id.* at 203, 873 A.2d at 480. Thus, the knowledge obtained by Mr. Benjamin during his lifetime cut short the limitations period which continued to run following his death.

35–36, 501 A.2d at 457–58 (holding that the statute of limitations applies to survival actions).

 Mr. Benjamin's express knowledge of his exposure to asbestos products, coupled with his express knowledge of his diagnosis of mesothelioma, was sufficient to put him on inquiry notice during his lifetime. *See O'Hara, supra,* 305 Md. at 302, 503 A.2d at 1324 (noting that a plaintiff is on notice when he has "knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[ ] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort]."). We agree with the Court of Special Appeals that, given the state of the general knowledge of occupational diseases and asbestos exposure in 1997, "[a]ll of the facts necessary to make a claim were in existence at the time of the diagnosis of mesothelioma, and a reasonable inquiry would have disclosed a cause of action." *Benjamin,* 162 Md.App. at 204, 873 A.2d at 481; *See Globe American, supra,* 76 Md.App. at 534, 547 A.2d at 658 (noting that in a survival action, the cause of action accrues during the victim's lifetime); *Trimper,* 305 Md. at 52, 501 A.2d at 457–58 ("[I]nvolving latent development of disease, any cause of action of the injured person accrues either (1) when he ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his injury, or (2) at death, whichever first occurs.").

The decedent's cause of action for personal injuries accrued in 1997, during his lifetime, when he was placed on inquiry notice. The survival action was not filed until 2003. The personal representative's cause of action, filed on behalf of Mr. Benjamin, under the survival statute, is barred by limitations because the claim was brought more than three years after the date of accrual. Accordingly, the trial court did not err in granting petitioners' motion for summary judgment concerning the survival action.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. THE PARTIES ABIDE THEIR COSTS.**