929 A.2d 19

**Mary CARROLL**

v.

**Phillip H. KONITS, M.D. et al.**

**No. 117, Sept. Term, 2006.**

Court of Appeals of Maryland.

July 27, 2007.

168

Darren Margolis (Bierer, Margolis & Curtis, P.A. of Baltimore), on brief, for appellant.

Michelle R. Callender (Wharton, Levin, Ehrmantraut & Klein, P.A. of Annapolis), on brief, for appellees.

George S. Tolley, III, Dugan, Babij & Tolley, LLC, Timonium, for brief of Amicus Curiae Maryland Trial Lawyers Association.

Albert D. Brault, Joan F. Brault, Brault Graham, LLC, Rockville, brief of Amici Curiae, Medical Mutual Liability Ins. Society of Maryland and Medstar Health, Inc.

Argued before BELL C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, and WILNER, ALAN M. (Retired, specially assigned), JJ.

CATHELL, J.

This matter arises from a medical malpractice claim filed by Mary Carroll, appellant, against Dr. Phillip H. Konits and Dr. Efem E. Imoke, appellees. Carroll, in accordance with applicable law, initially filed her complaint with the Health Care Alternative Dispute Resolution Office (the "HCADRO").[1] Thereafter, the claim was transferred to the Circuit Court for Baltimore City. The Circuit Court dismissed the case on various grounds, including, but not limited to, Carroll's failure to submit a proper certificate of qualified expert ("Certificate")[2] as required by the Health Care Malpractice Claims Statute (the "Statute"), Maryland Code (1974, 2002 Repl.Vol., 2006 Cum.Supp.), § 3–2A–04(b) of the Courts and Judicial Proceedings Article.

Carroll filed a timely appeal to the Court of Special Appeals. On January 2, 2007, while the appeal was pending in the intermediate appellate court, this Court issued a writ of certiorari on its own motion to review the following question:

---

1. Prior to January 11, 2005, this office was known as the Health Claims Arbitration Office. Maryland Code (1974, 2006 Repl.Vol.), § 3–2A–03 of the Courts and Judicial Proceedings Article (describing in the Editor's note when the name change was made by the General Assembly and when it was to take effect). We refer to the office by its current name throughout this opinion.

2. Various sources use different language to refer to the document that is to be filed with a complaint alleging malpractice. The relevant statute uses "certificate of qualified expert." Other sources use "Certificate of Merit" in reference to the same document. We use "Certificate" herein.

"Did the Circuit Court err in finding that Mary Carroll's expert witness report and certification was legally insufficient, thereby dismissing the case?"

*Carroll v. Konits,* 396 Md. 524, 914 A.2d 768 (2007).

We hold that a Certificate is a condition precedent and, at a minimum, must identify with specificity, the defendant(s) (licensed professional(s)) against whom the claims are brought, include a statement that the defendant(s) breached the applicable standard of care, and that such a departure from the standard of care was the proximate cause of the plaintiff's injuries. In the case *sub judice,* the certificate was incomplete because it failed to specifically identify the licensed professionals who allegedly breached the standard of care and failed to state that the alleged departure from the standard of care, by whichever doctor the expert failed to identify, was the proximate cause of Carroll's injuries. Therefore, because the Certificate is a condition precedent, the Circuit Court for Baltimore City correctly granted the appellees' motion to dismiss the case and, accordingly, we affirm the judgment of the Circuit Court for Baltimore City.

## I. Factual and Procedural Background

On September 19, 2001, Dr. Imoke performed a unilateral mastectomy of Carroll's left breast. As a part of the procedure, Dr. Imoke left a catheter[3] inside Carroll's chest so that

---

**3.** According to Taber's Cyclopedic Medical Dictionary, 1734 (20th ed.2005), porta means: "The point of entry of nerves and vessels into an organ or part." A catheter is: "A tube passed into the body for evacuating fluids or injecting them into body cavities. It may be made of elastic, elastic web, rubber, glass, metal, or plastic." *Id.* at 357, 911 A.2d 427. To the nonmedical mind, the combination of these words may be somewhat confusing with respect to the present context. Apparently, however, the combination of these terms, in reference to the procedure at issue, is standard practice in the medical community.

An information sheet provided to patients by the Duke Comprehensive Cancer Center (which has no involvement in the present case), better explains the meaning of the term and the operation of the device:

"[I]mplanted port for central venous access (porta-cath) allow[ing] a nurse to inject or infuse medication into a long term catheter which has been placed in a vein in the upper chest (just below the collar

chemotherapy could be administered. Carroll claims that she was not aware that the catheter was inserted at the time that it occurred. The catheter was supposed to be removed within two months after Carroll completed chemotherapy. Dr. Imoke, however, did not make a follow-up appointment to remove the catheter. Instead, he relied on Dr. Konits, Carroll's oncologist, to inform him that Carroll had completed chemotherapy.

She completed chemotherapy on April 11, 2002. The catheter was not removed, however, until March 25, 2003—two and one-half years after it was initially inserted. Carroll asserts that she suffered pain and discomfort, a deep vein thrombosis, and chronic venous stasis of the right arm with chronic lymph edema due to the catheter being left inside her chest for a prolonged period of time.

On March 25, 2005, Carroll filed a complaint with the HCADRO. She alleged that Drs. Konits and Imoke were negligent in failing to communicate the need to have the catheter removed in a timely manner. Approximately four months later, on August 4, 2005, Carroll filed a letter signed by Dr. Wanda J. Simmons–Clemmons, which purported to be a Certificate. Dr. Simmons–Clemmons summarized a timeline of Carroll's medical treatments and then wrote:

> "In my professional opinion, there was no clear communication to the patient that indicated she should seek medical attention in the removal of the catheter from her chest after chemotherapy was completed. If this was done, it

---

bone). The catheter may stay in place for weeks or months. This makes it unnecessary for the patient to need an IV started every time it is necessary to give medication into a vein. The catheter also makes it possible for blood to be drawn from the catheter and not through vein sticks...."
A doctor would order a porta-cath inserted for "patients who will require medications to be given into a vein many times over weeks or months [e.g. a patient undergoing chemotherapy]. It also makes frequent blood draws for blood tests easier since the blood can be taken from the catheter. *See* http://cancer.duke.edu/pated/Materials/Procedures/_ ImplantablePortInsertionCare.pdf, last visited on June 25, 2007. Hereinafter we will use the term catheter to refer to the device inserted into Carroll.

was not documented. Secondly, there was mention made of an approximate time chemo should be completed by Dr. Konits in his consult dated January 31, 2002. The note was signed off by Dr. Ohio; however, there was mention of completion of chemo in multiple subsequent office visits. Also, the patient was to follow-up with Dr. Imoke in September 2002. Again, no mention was made that the patient should call sooner if and when chemo ended. Neither was the patient recalled for her September 2002 follow-up. If this was done I do not have a copy of the documentation of it. Thirdly, it does appear that Mrs. Mary Carroll suffered complications arising from having a catheter in place for too long[,] i.e. A DVT and chronic venous stasis of the right arm with chronic lymphedema."

On October 3, 2005, after more than 180 days had elapsed from the time that Carroll initially filed her complaint,[4] Drs.

---

4. Maryland Code (1974, 2002 Repl.Vol., 2006 Cum.Supp.), § 3–2A–04(b)(1)(i) of the Courts and Judicial Proceedings Article, allows a claimants a period of 90 days, from the initial filing of the complaint, to file the Certificate. Section 3–2A–04(b)(1)(ii) provides that:

"In lieu of dismissing the claim or action, the panel chairman or the court shall grant an extension of no more than 90 days for filing the certificate required by this paragraph, if:
1. The limitations period applicable to the claim or action has expired; and
2. The failure to file the certificate was neither willful nor the result of gross negligence."

Thus, the time period in which Carroll must have filed her certificate is 180 days from the filing of her initial complaint. *See also McCready Memorial Hosp. v. Hauser*, 330 Md. 497, 508, 624 A.2d 1249, 1255 (1993) (concluding that the "90–day extension commences, without the necessity of a request, upon the expiration of the initial 90–day period and is only available where the expert's certificate is filed within the 90-day extension period, *i.e.*, within 180 days of filing the initial complaint.")

We note that in order to grant an extension the plain language of the statute requires that both the statute of limitations has expired and that the failure to file the certificate was neither willful nor the result of gross negligence. The issue of whether the initial 90 day extension was proper is not before this Court and we do not resolve it. For a discussion of when the granting of 90 day extension is appropriate *see McCready, supra.*

Konits and Imoke filed a motion to dismiss the claim with the HCADRO on the basis that Dr. Simmons–Clemmons's documentation was deficient under the requirements set forth in § 3–2A–04(b) of the Courts and Judicial Proceedings Article. Drs. Konits and Imoke claimed that Carroll failed to file a Certificate and that she merely tendered an informal, unsworn letter. On October 5, 2005, Carroll requested that, "in the interest of justice[,]" the Director grant her an additional 60 days to correct the deficiencies in the document filed.[5] The Director acting, "in the interest of justice," granted Carroll's request for additional time, giving her until December 1, 2005, to correct the deficiencies. On October 28, 2005, Carroll submitted an amended certification in an attempt to cure the defects in the original submission. The certificate again contained a summary of Carroll's medical visits and treatments and included the same language quoted *supra,* except that Dr. Simmons–Clemmons altered the language from "it does appear that Mrs. Mary Carroll suffered complications arising from having a catheter in place for *too long*" to "having a catheter in place for *longer than what is standard treatment[.]* "(Emphasis added).

Additionally, a new paragraph was added to the second letter that stated:

"It is my professional opinion that Mrs. Carroll sustained injury secondary to below standard of care received in regards to removal of the Hickman catheter after chemotherapy. Please be advised that I do not devote more than 20 percent of my annual time to activities that directly involve personal injury claims."

On December 2, 2005, Dr. Konits renewed his motion to dismiss on the grounds that the updated certificate still failed to meet the specific requirements of § 3–2A–04(b). On or about the same date, Carroll waived arbitration and the matter was transferred to the Circuit Court for Baltimore City.

---

**5.** This extension occurred when there was nothing to extend. The original 90 + 90, i.e., 180 day period had already expired.

On December 30, 2005, Dr. Konits filed a motion to dismiss in the Circuit Court for Baltimore City on the same grounds as the previous two—that the certificate and report did not comply with the relevant provisions of the Statute. On March 22, 2006, the Circuit Court dismissed the case against Dr. Konits.[6] This appeal ensued.

## II. Standard of Review

When an appellate court reviews a trial court's grant of a motion to dismiss a complaint: "[T]he truth of all well-pleaded relevant and material facts is assumed, as well as all inferences which can be reasonably drawn from the pleadings." *Odyniec v. Schneider*, 322 Md. 520, 525, 588 A.2d 786, 788 (1991). Generally, dismissal at the trial court level will only be ordered if, after assuming the allegations and permissible inferences flowing therefrom are true, the plaintiff would not be afforded relief. *McNack v. State*, 398 Md. 378, 920 A.2d 1097, 1102 (2007) (citing *Lloyd v. General Motors Corp.*, 397 Md. 108, 121, 916 A.2d 257, 264 (2007)).

## III. Discussion

The Health Care Malpractice Claims Statute has consistently been interpreted by this Court as an attempt by the General Assembly, in substantial part, to limit the filing of frivolous malpractice claims. *See Witte v. Azarian*, 369 Md. 518, 526, 801 A.2d 160, 165 (2002) (recognizing that the General Assembly passed the Statute as part of a "multi-phase response to the malpractice insurance 'crisis' that arose in 1974...."); *McCready Memorial Hosp. v. Hauser*, 330 Md. 497, 500, 624 A.2d 1249, 1251 (1993) ("[T]he General Assembly enacted the [Statute] in response to explosive growth in

---

6. The trial judge did not specify that dismissal was without prejudice. The effect of failing to specify that dismissal was with or without prejudice is that the dismissal was without prejudice. *See* Maryland Rule 2–506(c) stating, in pertinent part, "[u]nless otherwise specified in the notice of dismissal, stipulation, or order of court, a dismissal is without prejudice...." Dr. Imoke filed a separate motion to dismiss which was granted with prejudice. The issue of the appropriateness of the granting of that motion *with prejudice,* is not presented in this case.

medical malpractice claims and the resulting effect on health care providers' ability to obtain malpractice insurance."); *Attorney General v. Johnson,* 282 Md. 274, 278–79, 385 A.2d 57, 60 (1978) (recognizing that: "[T]he general thrust of the Act is that medical malpractice claims be submitted to arbitration as a precondition to court action ....") *overruled on other grounds by Newell v. Richards,* 323 Md. 717, 734, 594 A.2d 1152, 1161 (1991).[7] What little legislative history remains from the passage of the original Statute supports this interpretation.

On July 23, 1975, the President of the Senate and the Speaker of the House created the Medical Malpractice Insurance Study Committee (the "Committee") to craft and propose solutions to the medical malpractice problems confronting the State. State of Md. Medical Malpractice Ins. Study Comm., Report to the President of the Senate and the Speaker of the House, p. 1, (January 6, 1976). The Committee consisted of six Senators, six Delegates, medical experts, legal experts, hospital and insurance experts, and a representative from the Governor's office. It "was charged with the task of seeking a permanent solution to the myriad problems of medical malpractice insurance facing the physicians and patients of the State of Maryland." *Id.* The Committee's report to the General Assembly was to be "introduced for consideration by the General Assembly in its 1976 Session." *Id.* at 3. After reviewing position papers and conducting public hearings on the matter, the majority of the Committee reached a consensus that it was interested in "some form of legislation mandating arbitration." *Id.* at 2. This consensus was due, in part, to the fact that almost all of the testimony heard by the Committee "included recommendations for some type of mechanism to

---

7. The *Newell* Court expressly disapproved of language in *Johnson* that implied that the appeals process used in under Workers' Compensation Act was to be applied to claims brought under the Health Care Malpractice Claims Statute. The discussion therein on this issue has no relevance to the case at bar. *See Newell,* 323 Md. at 728–735, 594 A.2d at 1158–1161.

*screen malpractice claims prior to the filing of the suit."* [8] *Id.* at 3 (emphasis added). Essentially, two types of screening mechanisms were suggested: "(1) a medical review panel and (2) an arbitration panel." *Id.* at 3. The end result of these recommendations was the adoption of the Health Care Malpractice Claims Statute in 1976, for "the purpose of providing for a mandatory arbitration system for all medical malpractice claims in excess of a certain amount[.]" 1976 Laws of Maryland, Chapter 235. It is clear from a plain reading of the original Statute and the existing legislative history that the General Assembly intended the original Health Care Malpractice Claims Statute to screen—and to first substitute the arbitration process as to malpractice claims—prior to the filing of lawsuits.

*The **Relevant Version** of the Health Care Malpractice Claims Statute*

■ The Health Care Malpractice Claims Statute, establishes exclusive procedures for filing a civil action, in excess of a certain amount, against a health care provider. Maryland Code (1974, 2002 Repl. Vol., 2006 Cum.Supp.), § 3–2A–02(a) of the Courts and Judicial Proceedings Article. This was true in 1976 and is still true today. Since 1976, however, other aspects of the Statute have been amended. Relevantly, the 1986 amendment required the filing of a Certificate and an attesting expert's report.[9] *See* 1986 Laws of Maryland, Chap-

---

8. The Maryland State Bar Association, for example, recommended to the General Assembly (it is unclear whether they did so directly or through the Committee):

"[T]he creation of a procedure which ... would add an additional measure of cost predictability by encouraging resolution of disputes prior to full-scale trial in the courts. This procedure would involve non-binding pre-trial screening of all medical malpractice claims. Our proposal is as follows:

(1) No person would have a cause of action for medical malpractice in Maryland prior to the submission of his claim to and the issuance of a determination by a pre-trial screening panel...."

Maryland State Bar Association, Report to the Special Committee to Consider Problems Related to Medical Malpractice in Maryland, p. 3.

9. In *Walzer v. Osborne*, 395 Md. 563, 582, 911 A.2d 427, 438 (2006), we explained the difference between a Certificate and an attesting expert's report, saying:

ter 640. By enacting the 1986 amendment, the General Assembly determined that, in the context of a medical malpractice claim, in order to maintain an action against a health care provider, a plaintiff is required to file a Certificate and an attesting expert's report *in addition to* filing a complaint. A plaintiff must file a "certificate of qualified expert" that attests to the departure from the standard of care.[10] § 3–2A–04(b)(1)(i)(1). The statute also requires that the certificate be filed with a "report of the attesting expert attached." § 3–2A–04(b)(3)(i). The penalty for failing to file the required certificate and report within 90 days (subject to a 90 day extension and the possibility of an additional good cause extension) of the filing of the complaint is dismissal without prejudice:

> "Except as provided in subparagraph (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint. . . ."

---

"While it is arguably unclear from the Statute exactly what the expert report should contain, common sense dictates that the Legislature would not require two documents that assert the same information. Furthermore, it is clear from the language of the Statute that the certificate required of the plaintiff is merely an assertion that the physician failed to meet the standard of care and that such failure was the proximate cause of the patient-plaintiff's complaints. . . . It therefore follows that the attesting expert report must explain how or why the physician failed . . . to meet the standard of care and include some details supporting the certificate of qualified expert. . . . [T]he expert report should contain at least some additional information and should supplement the Certificate. Requiring an attesting expert to provide details, explaining how or why the defendant doctor allegedly departed from the standards of care, will help weed out non-meritorious claims and assist the plaintiff or defendant in evaluating the merit of the health claim. . . ."

**10.** If the defendant does not dispute liability, no certificate is required. § 3–2A–04(b)(2)(ii). In the present case, the appellees dispute liability. Thus, the certificate was required.

§ 3–2A–04(b)(1)(i)(1). Although the statutory scheme is slightly more complex, it is clear that unless the Certificate and the attached attesting expert's report are filed within a maximum of 180 days (absent the grant of a good cause extension), dismissal is mandatory. Thus, just as a plaintiff in a medical malpractice claim must file a satisfactory complaint, he or she must also file a satisfactory Certificate and report or risk dismissal.[11]

An underlying issue herein is whether the requirement to file a proper Certificate operates as a condition precedent to the maintenance of a malpractice claim. Many of our cases have recognized that the *arbitration process,* as a whole, was designed to be a condition precedent to the filing of a claim in a circuit court. *Witte,* 369 Md. at 527, 801 A.2d at 166 (recognizing that a claimant must file with the HCADRO and comply with all statutory provisions before proceeding to a circuit court); *McCready,* 330 Md. at 512, 624 A.2d at 1257 (finding that: "The Maryland Health Care Malpractice Claims Statute mandates that claimants arbitrate their claims before the [HCADRO] as a condition precedent to maintaining suit in circuit court."); *Crawford v. Leahy,* 326 Md. 160, 165, 604 A.2d 73, 75 (1992) (stating that: "The mandatory arbitration requirement does not divest courts of subject matter jurisdiction over health claims, but rather creates a condition precedent to the institution of a court action. Upon fulfillment of the condition precedent, malpractice claims may be heard in court." (citations omitted) (quotations omitted)); *Su v. Weaver,* 313 Md. 370, 377, 545 A.2d 692, 695 (1988) (recognizing that: "The [Statute] substantially altered the procedure in which a medical malpractice claim is brought against a health care

---

11. The determination of whether a Certificate and report are satisfactory, like the determination of whether a complaint sufficiently states a legally cognizable claim, is a determination to be made as a matter of law. As such, the standard for determining whether a Certificate or report is legally sufficient is the same as determining whether a complaint is legally sufficient, i.e., dismissal is only appropriate if, after assuming the truth of the assertions in the Certificate and report, and all permissible inferences emanating therefrom, the requirements set forth in the Health Care Malpractice Claims Statute are not satisfied.

provider by requiring a malpractice claim to be submitted to a mandatory arbitration proceeding as a condition precedent to maintaining such an action in the circuit court."); *Ott v. Kaiser–Georgetown Community Health Plan, Inc.,* 309 Md. 641, 645, 526 A.2d 46, 48–49 (1987) (stating that: "If a claimant wishes to reject an award and proceed with the cause of action, the special procedures prescribed by the Act must be followed.").

Although it is clear that the arbitration process is a condition precedent to the filing of a claim in the Circuit Court, the question still remains whether § 3–2A–04 establishes that the filing of a proper Certificate is a condition precedent to maintaining a claim for malpractice. In *McCready,* we stated that the Statute requires arbitration prior to pursuing a claim in the circuit court and then said: "A claimant's filing of an expert's certificate is an *indispensable step* in the ... arbitration process." 330 Md. at 512, 624 A.2d at 1257 (emphasis added). In other words, the arbitration process cannot occur without the filing of a Certificate. Thus, we conclude that the filing of a proper Certificate operates as a condition precedent to filing a claim in Circuit Court because arbitration is a condition precedent to filing a claim in a Circuit Court and because the filing of a Certificate is an *indispensable step* in the arbitration process, i.e., it must occur or the condition precedent is not satisfied. Therefore, if a proper Certificate has not been filed, the condition precedent to maintain the action has not been met and dismissal is required by the Statute once the allotted time period has elapsed. *See Walzer,* 395 Md. at 578, 911 A.2d at 435 (concluding that the Statute mandates dismissal when the claimant fails to file the Certificate within the time period allotted by the Statute); *Witte,* 369 Md. at 533, 801 A.2d at 169 (stating that: "In the absence of a certificate signed by a qualified expert on behalf of the claimant, the case cannot proceed beyond the point at which the certificate is required...."); *Goicochea v. Langworthy,* 345 Md. 719, 729, 694 A.2d 474, 480 (1997) (recognizing that: "Langworthy's malpractice claim ... was dismissed by the [HCADRO] because he did not file the

certificate of a qualified medical expert attesting to the merit of his claim, *as required by § 3–2A–04(b)* . . . . (Emphasis added)).”[12]

### Preservation for Appellate Review

As a threshold issue, Dr. Imoke contends that Carroll failed to preserve her arguments for appellate review and that this Court should not address the merits of her arguments. He explains that Carroll conceded that she had not complied with the statutory requirements and told the trial court that her expert was in the process of providing a certified statement. Dr. Imoke contends that Carroll did not submit a properly amended certified statement before the Circuit Court dismissed the case, and is now arguing, for the first time on appeal, that the amended letter complied with the statutory requirements. As such, according to Dr. Imoke, she failed to preserve these arguments for appellate review.

---

**12.** In *Georgia–Pacific Corp. v. Benjamin,* 394 Md. 59, 904 A.2d 511 (2006), we discussed the mandatory nature of conditions precedent, albeit in a different context. There we said:

“ ‘[A] condition precedent cannot be waived under the common law and a failure to satisfy it can be raised at any time because the action itself is fatally flawed if the condition is not satisfied. This requirement of strict or substantial compliance with a condition precedent is of course subject to abrogation by the General Assembly.’ ”

*Georgia–Pacific Corp.,* 394 Md. at 84, 904 A.2d at 526 (quoting *Rios v. Montgomery County,* 386 Md. 104, 127–28, 872 A.2d 1, 14 (2005). A statute of limitations, on the other hand, is designed to:

“ ‘(1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy.’ ”

*Georgia–Pacific Corp.,* 394 Md. at 85, 904 A.2d at 526 (quoting *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983)).

We then summarized the difference between the two, saying:

“Further, ‘in contrast [to a condition precedent to maintaining an action], a statute of limitations affects only the remedy, not the cause of action.’ *Waddell[ v. Kirkpatrick],* 331 Md. [52,] 59, 626 A.2d [353,] 353 [(1993)]. The defense of limitations may be waived; however, a condition precedent to liability may not be waived. *Rios,* 386 Md. at 127–28, 872 A.2d at 14.”

*Georgia–Pacific Corp.,* 394 Md. at 85, 904 A.2d at 526.

■ We note that Carroll argued, before the Circuit Court, that her initial Certificate complied with the statutory requirements and told the trial court that her expert was in the process of providing an amended Certificate. Despite the fact that Carroll's arguments at the trial level pertained to the initial Certificate, we conclude that the substance of her arguments was sufficient to preserve for appellate review the issue of whether her Certificate complied with the requirements set forth in the Health Care Malpractice Claims Statute.

*The Director's Authority to Grant an Extension* [13]

Dr. Konits argues that the Director did not have the discretion to grant Carroll an extension of time because it was not filed within the 180–day period and good cause was not established. He argues, therefore, that this Court should not address the propriety of Dr. Simmons–Clemmons's purported Certificates of Merit.

Section 3–2A–04(b)(5) states that "[a]n extension of the time allowed for filing a certificate of a qualified expert under this subsection shall be granted for good cause shown." Similarly, § 3–2A–05(j), states:

"Except for time limitations pertaining to the filing of a claim or response, the Director or the panel chairman, for good cause shown, may lengthen or shorten the time limita-

---

13. We point out that § 3–2A–02(d), provides that the Maryland Rules control the practice and procedure arising from the Health Care Malpractice Claims subtitle. Section 3–2A–02(d), states that:
  "Except as otherwise provided, the Maryland Rules shall apply to all practice and procedure issues arising under this subtitle."
Maryland Rule 1–204(a) provides in relevant part:
  "When these rules or an order of court require or allow an act to be done at or within a specified time, the court, on motion of any party and for cause shown, may (1) shorten the period remaining, (2) extend the period *if the motion is filed before the expiration of the period originally prescribed or extended by a previous order,* or (3) on motion filed after the expiration of the specified time period, permit the act to be done *if* the failure to act was the result *of excusable neglect. . . .* "(Emphasis added.)

tions prescribed in subsections (b) and (g) of this section and § 3–2A–04 of this article."

Dr. Konits contends that no extension could be granted for good cause because Carroll did not request the good cause extension within the 180–day period. We rejected that exact argument in *Navarro–Monzo v. Washington Adventist Hosp.*, 380 Md. 195, 844 A.2d 406 (2004). There we said:

"Appellees present the same argument to us that they raised in the Circuit Court, namely, that § 3–2A–04(b)(1)(ii) permits but one 90–day extension and that, if any further extension is to be sought under either § 3–2A–04(b)(5) or § 3–2A–05(j), the extension must be sought before the expiration of the 90–day extension granted under § 3 –2A– 04(b)(1)(ii)." Relying on *McCready*, they aver that, once [the initial 90–day] extension period expires, the claim must be dismissed. Their reliance, and the Circuit Court's reliance, on *McCready* is misplaced.

. . .

"We expressly recognized . . . in *McCready*, [] that 'there could conceivably be instances where there might be "good cause" to grant a request for an extension that was made after the initial ninety-day period in lieu of dismissing the claim.' *McCready*, 330 Md. at 506 n. 5, 624 A.2d at 1254 n. 5. Indeed, §§ 3–2A–04(b)(5) and 3–2A–05(j) would have little or no meaning unless read to permit good cause extensions over and above the mandatory extension called for in § 3– 2A–04(b)(1)(ii)."

*Navarro–Monzo*, 380 Md. at 200–04, 844 A.2d at 409–11.

In light of our resolution of this case, we will not resolve Dr. Konits's contention that the Director lacked good cause to grant Carroll's extension. We did state in *Navarro–Monzo*, 380 Md. at 205, 844 A.2d at 412, that:

"Although the arbitration process itself is not in the nature of an administrative remedy, [the HCADRO] is an administrative agency within the Executive Branch of the State Government (*see* CJP § 3–2A–03), and therefore its Di-

rector, in administering that office, acts as an administrative official.  In reviewing the administrative decisions of the Director, we must afford at least the same deference that we afford to other administrative agencies in making discretionary decisions, including, in the absence of some clear indication in the record to the contrary, an assumption that the Director is aware of the law controlling his/her conduct and acts in conformance with it."

Additionally, we explained in *McCready*, that the good cause extensions are "malleable[,]" again, generally, leaving room for the Director's discretion.  330 Md. at 509, 624 A.2d at 1255.

■ While Carroll never mentioned the phrase "good cause," in her request for an extension, she explained that she had filed her Certificate in a timely manner, and that its contents complied with the statutory provisions set forth in the Health Care Malpractice Claims Statute.  She explained further that her attesting expert was already in the process of amending the Certification to provide additional information that was already available to her.[14]  Lastly, Carroll asked the Director to grant an extension based on the interests of justice.  In response, the Director utilized his discretionary powers to grant the extension "upon review and consideration of Claimant's Answer To Motion To Dismiss and in the interest of justice[.]"  In accordance with the statutory language and consistent with our prior case law, we believe that the General Assembly made it clear that the good cause extensions are discretionary and without time limitations, so long as the Claimant demonstrates good cause.  As indicated earlier, we need not and do not resolve the nature of the "good cause" asserted in this case.[15]

---

14.  Carroll filed the amended Certificate only one day after the Director granted the extension.

15.  We note a recent change in the law pertaining to the procedure for claims dismissed under § 3–2A–04(B)(3) of the Statute.  The General Assembly enacted Chapter 324 of the 2007 Laws of Maryland to be inserted as § 5–118 in the Courts and Judicial Proceedings Article.  Its purpose clause provides:

### The Certificate and the Report

We now turn to the parties' arguments regarding the Certificate and the attesting expert's report. Carroll does not challenge the existence of the condition precedent requirement discussed, *supra*. Instead, she presents arguments of definition, i.e., that nothing in the statutory scheme defines the

"FOR the purpose of authorizing the commencement of a new civil action *or claim* if a prior action *or claim* for the same cause *against the same party or parties* was commenced within the applicable period of limitations, and *was* dismissed ~~or terminated in a manner other than by a final judgment on the merits~~ *without prejudice for failure to file a certain report under certain circumstances....*"
2007 Laws of Maryland, Chapter 324. The actual text to be inserted as § 5-118 of the Courts and Judicial Proceedings Article states that:
"*(A) (1) THIS SECTION DOES·NOT APPLY TO A VOLUNTARY DISMISSAL OF A CIVIL ACTION OR CLAIM BY THE PARTY WHO COMMENCED THE ACTION OR CLAIM.*

*(2) THIS SECTION APPLIES ONLY TO A CIVIL ACTION OR CLAIM THAT IS DISMISSED ONCE FOR FAILURE TO FILE A REPORT IN ACCORDANCE WITH § 3-2A-04(B)(3) OF THIS ARTICLE.*

(B) IF A CIVIL ACTION *OR CLAIM* IS COMMENCED BY A PARTY WITHIN THE APPLICABLE PERIOD OF LIMITATIONS AND IS DISMISSED ~~OR TERMINATED IN A MANNER OTHER THAN BY A FINAL JUDGMENT ON THE MERITS~~ *WITHOUT PREJUDICE*, THE PARTY MAY COMMENCE A NEW CIVIL ACTION OR CLAIM FOR THE SAME CAUSE ~~WITHIN~~ *AGAINST THE SAME PARTY OR PARTIES ON OR BEFORE* THE LATER OF:

(1) THE *EXPIRATION OF THE* APPLICABLE PERIOD OF LIMITATIONS; ~~OR~~

(2) ~~1 YEAR~~ ~~6 MONTHS~~ *60 DAYS* FROM THE DATE OF THE DISMISSAL; *OR*

*(3) AUGUST 1, 2007, IF THE ACTION OR CLAIM WAS DISMISSED ON OR AFTER NOVEMBER 17, 2006, BUT BEFORE JUNE 1, 2007* ~~OR TERMINATION~~."
2007 Laws of Maryland, Chapter 324.
Chapter 324 also provides how this enactment is to be construed in relation to the date it became effective:
"SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any action *or claim* dismissed ~~or terminated~~ before the effective date of this Act *for which a final judgment has been rendered and for which appeals, if any, have been exhausted before the effective date of this Act.*
"SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect ~~October~~ *June* 1, 2007."
2007 Laws of Maryland, Chapter 324. The issues now being presented in the case *sub judice* are not affected by this new statute.

words "certificate" or "attesting," that the statute does not require a specific format, and that the words "certify" and "attest" do not actually have to appear in the certification or report. She also contends that the plain meaning of the word "attest," is "to affirm to be true or genuine," [16] and that Dr. Simmons–Clemmons submitted a document in which she "attested" to her professional opinions in accordance with this definition. In addition, Carroll asserts that the plain meaning of the word "certify" only requires an affirmation in writing.[17] Therefore, according to Carroll, the court erred when it dismissed the case based on a lack of formal attestation or certification.

Furthermore, according to Carroll, there is no stated requirement in § 3–2A–04 that the initial certification and report actually set forth that the expert is a "qualified expert" or that those qualifications have to be explained in the certificate. She also argues that there is no requirement in § 3–2A–04 that the expert use the words "proximate cause," or "reasonable degree of certainty." She contends that even though Dr. Simmons–Clemmons did not use either of those terms, the certification makes clear that "the lack of communication by appellees to Carroll concerning the removal of the catheter was the cause of her injuries." Lastly, Carroll contends that all of Drs. Konits and Imoke's assertions fail because they are not supported by the plain language of the statute.

Appellees argue that Dr. Simmons–Clemmons's documentation was deficient under the pertinent provisions the Health Care Malpractice Claims Statute for a multitude of reasons, any one of which justified the Circuit Court's dismissal of Carroll's claim. They contend that neither of the submissions from Dr. Simmons–Clemmons certified that she had clinical

---

**16.** Carroll cites *Cloverfields Improvment Association, Inc. v. Seabreeze Properties, Inc.*, 32 Md.App. 421, 431–32, 362 A.2d 675, 682 (1976), in which the intermediate appellate court relied on Black's Law Dictionary 166 (3d ed.1933) for the definition of the word "attest."

**17.** Carroll cites Ballentine's Law Dictionary (1969) for the definition of the word "certify."

experience in the field practiced by Drs. Konits and Imoke within five years from the date of the alleged negligence, as is required by § 3–2A–02(c)(2)(ii)(A), and that both letters failed to certify that Dr. Simmons–Clemmons is Board Certified in the same or related specialty as Drs. Konits and Imoke, as required by § 3–2A–02(c)(2)(ii)(B).[18] Drs. Konits and Imoke also argue that Dr. Simmons–Clemmons failed to provide any reference to her training, education, professional experience, practice area, field of specialty, and Board Certifications; her letters merely contained the initials "M.D." after her signature. Dr. Konits avers that "[t]he facial deficiencies of [Dr. Simmons–Clemmons's] letter/certificate are only exacerbated by the failure of [Carroll] to file an expert report from the certifying doctor as mandated by [§ ] 3–2A–04(b)(3)...."[19]

Dr. Konits also argues that neither of Carroll's letters identified the health care professional(s) against whom her claims applied. Dr. Konits notes that the letters reference five physicians—Dr. Konits, Dr. Imoke, Dr. Ohio, an unidentified cardiologist, and an unidentified primary care physician. Furthermore, according to Dr. Konits, both letters failed to articulate opinions to a reasonable degree of medical probability, as is required by Maryland law. Dr. Konits contends that

---

**18.** Section 3–2A–02(c)(2)(ii)(A) and (B) provide in relevant part:

"(ii) 1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action; and

B. Except as provided in item 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified in the same or a related specialty as the defendant."

**19.** Section 3–2A–04(b)(3)(i) provides, as relevant:

"The attorney representing each party, or the party proceeding pro se, shall file the appropriate certificate with a report of the attesting expert attached."

Dr. Simmons–Clemmons's letter is not an appropriate "Certification" or "Attestation" of expert opinions but, instead, was an informal letter addressed to Carroll's attorney from Dr. Simmons–Clemmons. Dr. Konits further contends that Carroll's initial letter from Dr. Simmons–Clemmons was deficient because the physician failed to state the amount of professional time spent in testimonial activities for personal injury claims and Dr. Imoke also asserts that the initial letter was deficient because Dr. Simmons–Clemmons failed to attest to the departures from the standards of care.

### Statutory Construction

This case requires us to construe several provisions of the Health Care Malpractice Claims Statute and is primarily a matter of statutory interpretation. The first provision relevant to the case *sub judice* is § 3–2A–04(b) of the Courts and Judicial Proceedings Article. This section states, in pertinent part:

"(b) *Filing and service of certificate of qualified expert.*—Unless the sole issue in the claim is lack of informed consent:"

(1) (i) 1. Except as provided in subparagraph (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint;

. . .

(2) (i) A claim or action filed after July 1, 1986, may be adjudicated in favor of the claimant or plaintiff on the issue of liability, if the defendant disputes liability and fails to file a certificate of a qualified expert attesting to compliance with standards of care, or that the departure from standards of care is not the proximate cause of the alleged injury, within 120 days from the date the claimant or

plaintiff served the certificate of a qualified expert set forth in paragraph (1) of this subsection on the defendant.

. . .

(3) (i) The attorney representing each party, or the party proceeding pro se, shall file the appropriate certificate with a report of the attesting expert attached.

. . .

(4) A health care provider who attests in a certificate of a qualified expert or who testifies in relation to a proceeding before an arbitration panel or a court concerning compliance with or departure from standards of care may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims.

(5) "An extension of the time allowed for filing a certificate of a qualified expert under this subsection shall be granted for good cause shown."

Maryland Code (1974, 2002 Repl.Vol., 2006 Cum.Supp.), § 3–2A–02 of the Courts and Judicial Proceedings Article is also relevant and states, in pertinent part:

"(2) (i) This paragraph applies to a claim or action filed on or after January 1, 2005."

(ii) 1. In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action; and

B.   Except as provided in item 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified in the same or a related specialty as the defendant.

2.   Item (ii) 1.B of this subparagraph does not apply if:

A.   The defendant was providing care or treatment to the plaintiff unrelated to the area in which the defendant is board certified; or

B.   "The health care provider taught medicine in the defendant's specialty or a related field of health care."

The rules of statutory construction are well settled in this State. This Court recently outlined those rules in *Walzer v. Osborne*, 395 Md. 563, 571–74, 911 A.2d 427, 431–33 (2006), where we stated:

" 'The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature.' " *Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006); *Chow v. State*, 393 Md. 431, 443, 903 A.2d 388, 395 (2006) (citations omitted)....

"As this Court has explained, '[t]o determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning.' *State Dept. of Assessments and Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13, 702 A.2d 690, 696 (1997); *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448, 452 (1994)[.]   We do so 'on the tacit theory that the Legislature is presumed to have meant what it said and said what it meant.' *Witte v. Azarian*, 369 Md. 518, 525, 801 A.2d 160, 165 (2002). 'When the statutory language is clear, we need not look beyond the statutory language to determine the Legislature's intent.' *Marriott Employees Fed. Credit Union v. MVA*, 346 Md. 437, 445, 697 A.2d 455, 458 (1997). 'If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.' *Jones v. State*, 336 Md. 255, 261, 647 A.2d 1204, 1206–07 (1994).   In addition, '[w]e

neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning.' *Taylor v. NationsBank, N.A.*, 365 Md. 166, 181, 776 A.2d 645, 654 (2001). " 'If there is no ambiguity in th[e] language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends....' " *Chow*, 393 Md. at 443–44, 903 A.2d at 395.

"If the language of the statute is ambiguous, however, then 'courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment [under consideration].' *Fraternal Order of Police v. Mehrling*, 343 Md. 155, 174, 680 A.2d 1052, 1062 (1996) (quoting *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730, 732 (1986)). We have said that there is " 'an ambiguity within [a] statute' " when there exist " 'two or more reasonable alternative interpretations of the statute.' " *Chow*, 393 Md. at 444, 903 A.2d at 395 (citations omitted). When a statute can be interpreted in more than one way, " 'the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.' " *Id.*

'If the true legislative intent cannot readily be determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.'

*Witte*, 369 Md. at 525–26, 801 A.2d at 165. In construing a statute, '[w]e avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.' *Blake*

*v. State,* 395 Md. 213, [224,] 909 A.2d 1020, [1026] (2006) (citing *Gwin v. MVA,* 385 Md. 440, 462, 869 A.2d 822, 835 (2005)).

"In addition, " 'the meaning of the plainest language is controlled by the context in which it appears.' " " *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339, 1341 (1996) (citations omitted). As this Court has stated,

'[b]ecause it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.'

*Gordon Family P'ship v. Gar On Jer,* 348 Md. 129, 138, 702 A.2d 753, 757 (1997) (citations omitted). Lastly, "[s]tatutes in derogation of the common law are strictly construed, and it is not to be presumed that the legislature by creating statutory assaults intended to make any alteration in the common law other than what has been specified and plainly pronounced.'... 'Most statutes, of course, change the common law, so that principle [of narrow construction] necessarily bends when there is a clear legislative intent to make a change.' *Witte,* 369 Md. at 533, 801 A.2d at 169."

*Walzer,* 395 Md. at 571–74, 911 A.2d at 431–33 (some citations omitted).

As stated, *supra,* § 3–2A–04(b)(1)(i)(1) of the Courts and Judicial Proceedings Article, requires that:

"[A] claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director *attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury.*" (Emphasis added.)

■ Appellees interpret the above language as requiring the purported Certificate submitted by Dr. Simmons–Clemmons attest to a breach of the standard of care and that the breach was the proximate cause of Carroll's injuries.[20] We

---

**20.** Appellees articulated at oral argument seven specific requirements that Carroll must have satisfied before her Certificate could be complete

agree. The ordinary meaning of the word "attest" is "[t]o bear witness; testify" or "[t]o affirm to be true or genuine[.]" Black's Law Dictionary 138 (8th ed.1999). Reading § 3–2A–04(b)(1)(i)(1) in conjunction with this definition, we conclude that the language of this provision is clear and unambiguous and we need not resort to statutory interpretation. According to the plain language, a Certificate, under § 3–2A–04(b), must contain the qualified expert's affirmation as to two separate conditions—(1) that the defendant-physician departed from the standards of care, and (2) that such a departure was the proximate cause of plaintiff's alleged injury.

■ In examining Dr. Simmons–Clemmons's purported replacement Certificate, we conclude that even if she had satisfied the first stated requirement, she failed to satisfy the second requirement. The pertinent language of Dr. Simmons–Clemmons's second certificate, in which she discussed her professional medical opinion in reference to Carroll's medical care, is as follows:

"[I]t does appear that Mrs. Mary Carroll suffered complications arising from having the catheter in place for longer than what is standard treatment[,] (i.e. a DVT and chronic venous stasis of the right arm with chronic lymph edema.[) ]"

Dr. Simmons–Clemmons explained in the Certificate that the catheter was in place for "longer than what is standard treatment" and that the treatment that Carroll received was "below standard of care[.]" The first condition under § 3–2A–04(b), arguably, may have been satisfied.

As to the second and unsatisfied requirement, Dr. Simmons–Clemmons stated that:

"It is my professional opinion that Mrs. Carroll suffered injury secondary to below standard of care received in

under the Health Care Malpractice Claims Statute and Carroll argued that she complied fully with the requirements of the Statute based on the its plain language. We agree that Carroll failed to comply with certain statutory provisions that are required.

regards to removal of the Hickman catheter after chemo-therapy."

We assume that when Dr. Simmons–Clemmons stated that Carroll's *injury* was "secondary to below standard of care[,]" that she meant the *treatment* given to Carroll fell below the standard of care. Notwithstanding this assumption, Dr. Simmons–Clemmons failed to state, with clarity, that the treatment Carroll received or failed to receive, fell below the standard of care *and was the proximate cause of her injuries.* In fact, at no point, did she state that the alleged departure from the standard of care was the proximate cause of Carroll's injuries.[21]

Drs. Konits and Imoke also interpret the language of § 3–2A–04(b) as requiring that the Certificate identify the specific individual or individuals who breached the standard of care. According to Drs. Konits and Imoke, the purported Certificate is incomplete because it fails to identify specifically the li-

---

**21.** We recognize that "proximate cause" is a legal term. We do not think, however, that its meaning, in this context, is so obtuse that a person would need to spend a great deal of time studying the definition to understand its meaning. With respect to proximate cause, we have said:

"Variously stated, the universally accepted rule as to the proximate cause is that, unless an act, or omission of a duty, or both, are the direct and continuing cause of an injury, recovery will not be allowed. The negligent acts must continue through every event and occurrence, and itself be the natural and logical cause of the injury. It must be the natural and probable consequence of the negligent act, unbroken by any intervening agency, and where the negligence of any one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability."

*Bloom v. Good Humor Ice Cream Co.,* 179 Md. 384, 387, 18 A.2d 592, 593–94 (1941) (citations omitted). Alternatively, Black's Law Dictionary 234 (8th ed.2004), provides a generally applicable definition of proximate cause:

"1. A cause that is legally sufficient to result in liability; an act or omission that is considered in law to result in a consequence, so that liability can be imposed on the actor. 2. A cause that directly produces an event and without which the event would not have occurred."

censed professionals against whom Dr. Simmons–Clemmons's claims applied. Again, we agree.

■ Maryland law requires that the Certificate mention explicitly the name of the licensed professional who allegedly breached the standard of care. *See Witte,* 369 Md. at 521, 801 A.2d at 162 (explaining that "unless . . . the claimant files with the [Health Care Alternative Dispute Resolution Office] a certificate of a qualified expert attesting that *the defendant's* conduct constituted a departure from the standard of care and that the departure was the proximate cause of the alleged injury, the claim must be dismissed . . .") (emphasis added); *McCready,* 330 Md. at 500, 624 A.2d at 1251 (articulating that "the plaintiff must file a Certificate of Qualified Expert (expert's certificate) attesting to *a defendant's* departure from the relevant standards of care which proximately caused the plaintiff's injury") (emphasis added); *Watts v. King,* 143 Md. App. 293, 306, 794 A.2d 723, 731 (2002) (stating that claimants are "required to file a certificate of a qualified expert *attesting that the licensed professional* against whom the claim was filed breached the standard of care.") (emphasis added); *D'Angelo,* 157 Md.App. at 646, 853 A.2d at 822 (concluding that the expert's certificate must include the name of the licensed professional against whom the claims were brought because, without that information, "the certificate requirement would amount to a useless formality that would in no way help weed out non[-]meritorious claims."). We believe that this requirement is consistent with the General Assembly's intent to avoid non-meritorious claims. Moreover, it is reasonable because the Certificate would be rendered useless without an identification of the allegedly negligent parties. When a Certificate does not identify, with some specificity, the person whose actions should be evaluated, it would be impossible for the opposing party, the HCADRO, and the courts to evaluate whether a physician, or a particular physician out of several, breached the standard of care.

In the instant case, Dr. Simmons–Clemmons filed a certificate that included the names of five different physicians, two

of whom are the named defendants in this case. The report mentioned Dr. Imoke and Dr. Konits, but also mentioned a Dr. Ohio, an unnamed cardiologist, and an unnamed primary care physician. Dr. Simmons–Clemmons then stated very generally that "there was no clear communication to the patient. . . ." In so doing, Dr. Simmons–Clemmons failed to state with sufficient specificity which physician or physicians breached the standard of care and which physician or physicians were allegedly responsible for Carroll's injuries. Equally egregious, however, is that the Certificates failed to state what the standard of care was or *how* Dr. Imoke or Dr. Konits departed from it.

What was the standard of care expected of them? What duty did either have in regard to removing the catheter? Was Dr. Konits, the oncologist, supposed to remove the catheter, inserted surgically by Dr. Imoke, upon the termination of chemotherapy? Was he supposed to call Dr. Imoke to inform him that the chemotherapy had been completed? Was he supposed to tell Carroll to call Dr. Imoke? Was Dr. Imoke supposed to call Dr. Konits from time to time to check on the progress of the chemotherapy? Was he supposed to call Carroll from time to time for that purpose? Was he supposed to tell Carroll to call him when she completed chemotherapy?

The Certificate stated that "the patient was to follow-up with Dr. Imoke in September, 2002[]"—a year after the mastectomy—but it does not indicate where that information came from or whether Dr. Konits was, or should have been, aware of that fact. The Certificate stated that there was "mention made of an approximate time chemo[therapy] should be completed by Dr. Konits in his consult dated January 31, 2002," but it does not say when that time was, or how it related to the anticipated followup with Dr. Imoke in September, 2002. Interestingly, the complaint indicates that chemotherapy was completed in April, 2002, but the Certificate does not note that fact.

The Certificate adds that Carroll was not "recalled for her September 2002 follow-up." Was Dr. Konits responsible for

that? Was Dr. Imoke responsible for that? Did Carroll know she was supposed to follow up with Dr. Imoke? There is no indication that either defendant acted as Carroll's primary care physician. Was that unidentified doctor supposed to keep track of the chemotherapy and alert Carroll to the need to have the catheter removed? Was either defendant supposed to communicate with Carroll's primary care physician in this regard?

A general assertion, such as the one made by Dr. Simmons–Clemmons, that there was "no clear communication to the patient" by unspecified doctors regarding the timing of the removal of the catheter is deficient in two respects. Dr. Simmons–Clemmons did not explain in the Certificate the requisite standard of care owed to Carroll. Simmons–Clemmons also failed to state which doctor, or doctors, owed Carroll a specific duty under that standard. Without such statements by Dr. Simmons–Clemmons, the deficiencies in both the first and second Certificate go well beyond the issue of identity and proximate cause. The Certificates are wholly lacking in any assertion that either defendant departed from an applicable standard of care. They do not even come close to complying with the statutory requirement.

We therefore conclude that the alleged Certificate was also deficient in this respect and that the Circuit Court was correct in dismissing the case on the grounds that Carroll failed to file a proper Certificate. This conclusion is in accordance with this Court's interpretation of the application of the statutory requirements for the filing of medical malpractice claims.

Our cases are consistent with this conclusion. In *McCready,* we stated that:

"The basic procedures for initiating and maintaining a claim under the Statute are clear and simple. The Statute requires that a person with a medical malpractice claim first file that claim with the Director of the Health [Care Alternative Dispute Resolution] Office[]. § 3–2A–04(a). Thereafter, the plaintiff must file a certificate of qualified expert (expert's certificate) attesting to a defendant's departure

from the relevant standards of care which proximately caused the plaintiff's injury. § 3–2A–04(b)(1)(i)."

330 Md. at 500–01, 624 A.2d at 1251; *Odyniec,* 322 Md. at 533, 588 A.2d at 792 (in the context of explaining the operation of the statute, we opined that: "The Act requires a claimant at the commencement of the action to file a certificate prepared by a qualified expert stating that the practitioner departed from the standard of care and that such departure was the proximate cause of the injury . . . ."); *see also D'Angelo,* 157 Md.App. at 634, 649, 853 A.2d at 824 (outlining the steps for bringing a medical malpractice claim).

Even if we were to have found an ambiguity in the Statute, which we do not, the legislative history surrounding the enactment of the 1986 legislation supports our holding. That year, the General Assembly was again confronted with a medical malpractice crisis. In response, the Assembly enacted changes to almost every section in the Health Care Malpractice Claims Statute, including the one relevant to the present case— § 3A–02–04. As relevant to this case, the General Assembly inserted the following language into § 3A–02–04:

"(1) A CLAIM FILED AFTER JULY 1, 1986, SHALL BE DISMISSED, *WITHOUT PREJUDICE,* IF THE CLAIMANT FAILS TO FILE A CERTIFICATE OF A QUALIFIED EXPERT *WITH THE DIRECTOR* ATTESTING TO DEPARTURE FROM STANDARDS OF CARE . . ., *AND THAT THE DEPARTURE FROM STANDARDS OF CARE . . . IS THE PROXIMATE CAUSE OF THE ALLEGED INJURY,* WITHIN 90 DAYS FROM THE DATE OF THE COMPLAINT."

. . .

"(3) THE ATTORNEY REPRESENTING EACH PARTY, OR THE PARTY PROCEEDING PRO SE, SHALL FILE THE APPROPRIATE CERTIFICATE WITH A REPORT OF THE ATTESTING EXPERT ATTACHED.

DISCOVERY IS AVAILABLE AS TO THE BASIS OF THE CERTIFICATE."

1986 Laws of Maryland, Chapter 640.

Referring to the 1985 "Joint Report of the Executive/Legislative Task Force on Medical Malpractice Insurance," the *Summary of Committee Report* stated that the:

"Task Force voted to adopt the concept of a certificate of merit by a vote of 17 to 0, and the concept of a certificate of a meritorious defense by a vote of 11 to 8. *This provision is designed to reduce the number of frivolous claims and defenses.*"

*Summary of Committee Report,* S.B. 559, p. 4 (emphasis added). That the Certificate requirement was intended to curtail frivolous malpractice claims could only be more clearly demonstrated if the General Assembly had placed the above emphasized language in § 3–2A–04 itself. Although this statement alone is enough to persuade us that the General Assembly intended the new provision of § 3–2A–04 to limit frivolous lawsuits, the evolution of certain language in S.B. 559 is additional evidence of such intent.

The above underlined portions of subparagraph one indicate amendments to the original version of S.B. 559. According to the *Summary of Committee Report,* the Judicial Proceedings Committee added language to the original bill that required the certifying expert to state: *"THAT THE DEPARTURE FROM STANDARDS OF CARE ... IS THE PROXIMATE CAUSE OF THE ALLEGED INJURY[.]"* This language, requiring a specific statement of causal connection, was clearly intended to be another way (the first being the Certificate itself) to substantiate the merit of the claim being filed. Because this language remained in the final version of S.B. 559, the one that was enacted into law, the requirement is further evidence of the General Assembly's desire to make sure claims being filed were not frivolous. The thrust of the two 1986 amendments is to substantiate the claim being filed. Moreover, the 1986 amendments are consistent with the intent

of the original enactment in 1976, i.e., *to screen malpractice claims prior to the filing of suit.*

In light of our conclusion that the plain language of § 3–2A–04 requires the filing of a proper Certificate and proper attesting expert's report, we need not address the other issues raised by the parties.

## IV. Conclusion

For the foregoing reasons, we hold that a Certificate is a condition precedent and at a minimum, must identify with specificity, the defendant(s) (licensed professional(s)) against whom the claims are brought, include a statement that the named defendant(s) breached the applicable standard of care, and that such a departure from the standard of care was the proximate cause of the plaintiff's injuries. In the case *sub judice,* the certificate was incomplete because it failed to specifically identify the licensed professionals who allegedly breached the standard of care and failed to state that the alleged departure from the standard of care, by whichever doctor, or doctors, the expert failed to identify, was the proximate cause of Carroll's injuries. Therefore, because the Certificate is a condition precedent, the Circuit Court for Baltimore City correctly granted the appellees' motion to dismiss the case and, accordingly, we affirm the judgment of the Circuit Court for Baltimore City.

Judge Harrell joins in the judgment only.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY THE COSTS.**

Concurring Opinion by HARRELL, J.

I reluctantly concur in the result reached by the Majority opinion. Although I agree generally with the Dissent's analysis of the sufficiency of Dr. Simmons–Clemmons' 27 October 2005 letter report, I do not think it is the appropriate report to analyze in this case. Both the Majority opinion and the Dissent glide smoothly past the fact that Carroll failed to

present any cause, let alone good cause, to the Health Claims Alternative Dispute Resolution Office (HCADRO) for the needed extension of time to supplement her 3 August 2005 report. The August 3 report asserts that Dr. Simmons–Clemmons completed a review of the medical records in formulating her report. Her Answer To Motion To Dismiss before the HCADRO, in which she requested, "in the interest of justice," an extension of time to file ultimately what was to become the October 27 version, offered absolutely nothing in the way of good cause for an extension. She did not claim any factual or legal basis for not being in a position for her certifying doctor's August 3 report to have included everything required to be included there. Accordingly, the grant of the "good cause" extension by the HCADRO, on this record, was clearly erroneous as a matter of law and arbitrary and capricious as lacking any factual basis for good cause.

Confining consideration to the August 3 version (the only report properly before the Court), I am unable to join the Dissent, which places great weight in its analysis on the substantive additions found only in the October 27 version. In the important concluding lines of the August 3 report, the doctor states:

> Thirdly, it does appear that Mrs. Mary Carroll suffered complications arising from having a catheter in place for *too long,* i.e. A DVT and chronic venous stasis of the right arm with chronic lymph edema.

(emphasis added).

In the concluding lines of the October 27 report, Dr. Simmons–Clemmons revised somewhat and supplemented this language:

> Thirdly, it does appear that Mrs. Mary Carroll suffered complications arising from having a catheter in place for *longer than what is standard treatment,* i.e. a DVT and chronic venous stasis of the right arm with chronic lymph edema. *It is my professional opinion that Mrs. Carroll sustained injury secondary to below standard of care received in regards to removal of the Hickman catheter*

*after chemotherapy. Please be advised that I do not devote more than 20 percent of my annual time to activities that directly involve personal injury claims.* (emphasis added).

Without the modified and added language in the October 27 report, the Dissent's reasoning does not hold up:

> In examining Dr. Simmons–Clemmons's amended Certificate, it is clear that she satisfied the two stated requirements [departure from standard of care and proximate cause]. The pertinent language of Dr. Simmons–Clemmons's second certificate, in which she discusses her professional medical opinion in reference to Mrs. Carroll's medical care, is as follows:
>
> [I]t does appear that Mrs. Mary Carroll suffered complications arising from having the catheter in place for longer than what is standard treatment[,] (i.e. a DVT and chronic venous stasis of the right arm with chronic lymph edema.[) ]
>
> It is my professional opinion that Mrs. Carroll suffered injury secondary to below standard of care received in regards to removal of the Hickman catheter after chemotherapy.
>
> Dr. Simmons explained in the Certificate that the catheter was in place for "longer than what is standard treatment" and that the treatment that Mrs. Carroll received was "below standard of care." She therefore satisfied the first condition.
>
> As to the second requirement, Dr. Simmons–Clemmons stated that "there was no clear communication to the patient that indicated she should seek medical attention in the removal of the catheter from her chest after chemotherapy was completed," and further that Mrs. Carroll "suffered injury secondary to below standard of care received in regards to removal of the Hickman catheter after chemotherapy."

Dissent, op. at 204–05, 929 A.2d at 41–42.

Accordingly, I am compelled to join the judgment reached by the Majority in this case.

Dissenting Opinion by GREENE, J., which BELL, C.J., Joins.

I agree with the majority that Mrs. Carroll preserved for appellate review her arguments concerning the propriety of Dr. Simmons–Clemmons's Certificate and also that the Director had the authority and discretion to grant Mrs. Carroll's extension. I also agree that a Certificate must identify the health care provider against whom the claim is brought, and the certifying expert must attest to facts that support the allegation that the health care provider's conduct breached the applicable standard of care and that such a departure from the standard of care proximately caused the plaintiff's injuries. In this case, however, I believe that Mrs. Carroll submitted a Certificate that satisfied those minimum requirements. Therefore, the Circuit Court was incorrect to grant the appellees' motion to dismiss the case and, accordingly, I would reverse the judgment of the Circuit Court for Baltimore City.

As stated *supra*, § 3–2A–04(b)(1)(i) of the Courts & Judicial Proceedings Article states that

> a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the Director *attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury* . . . .

(Emphasis added.) The majority interprets this language as requiring that the Certificate contain the qualified expert's affirmation that the defendant-physician departed from the standards of care and that such a departure was the proximate cause of the plaintiff's alleged injury. I agree with that interpretation.

In examining Dr. Simmons–Clemmons's amended Certificate, it is clear that she satisfied the two stated requirements. The pertinent language of Dr. Simmons–Clemmons's second certificate, in which she discusses her professional medical opinion in reference to Mrs. Carroll's medical care, is as follows:

[I]t does appear that Mrs. Mary Carroll suffered complications arising from having the catheter in place for longer than what is standard treatment[,] (i.e. a DVT and chronic venous stasis of the right arm with chronic lymph edema.[) ]

It is my professional opinion that Mrs. Carroll suffered injury secondary to below standard of care received in regards to removal of the Hickman catheter after chemotherapy.

Dr. Simmons–Clemmons explained in the Certificate that the catheter was in place for "longer than what is standard treatment" and that the treatment that Mrs. Carroll received was "below standard of care." She therefore satisfied the first condition.

As to the second requirement, Dr. Simmons–Clemmons stated that "there was no clear communication to the patient that indicated she should seek medical attention in the removal of the catheter from her chest after chemotherapy was completed," and further that Mrs. Carroll "suffered injury secondary to below standard of care received in regards to removal of the Hickman catheter after chemotherapy." While Dr. Simmons–Clemmons never used the term "proximate cause" to explain the cause of Mrs. Carroll's injuries, she stated specific facts which causally linked the health care providers' breach of the standard of care to Mrs. Carroll's injuries. The substance of what Dr. Simmons–Clemmons said is obvious and is evidence of the cause of Mrs. Carroll's injuries.

It is well settled that several negligent acts may work together to cause an injury, and that each person whose negligent act is a cause of an injury may be legally responsible. *See Atlantic Mut. Ins. Co. v. Kenney,* 323 Md. 116, 127, 591 A.2d 507, 512 (1991) ("Negligence which constitutes a proximate cause of an injury need not necessarily be the sole cause.... In order to be a proximate cause, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause."); *see also Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851,

855 (1970). Moreover, proximate cause is a legal term and not a medical term. Dr. Simmons–Clemmons's certification of facts, with regard to causation, was consistent with the statutory requirements of § 3–2A–04(b) that the person making the certification must be a health care provider and attest to the facts that support the allegation that a health care provider's conduct breached the standard of care and the departure from the standard of care proximately caused the alleged injury.[1]

As stated *supra*, the purpose of the Certificate is to reduce the number of non-meritorious claims being submitted to the Health Care Alternative Dispute Resolution Office. Dr. Simmons–Clemmons, through her attestation, demonstrated that Drs. Konits and Imoke failed to communicate with each other and that such a failure caused Mrs. Carroll's catheter to remain in place for more than two years longer than what is standard medical procedure. Dr. Simmons–Clemmons also makes clear that because the catheter was left in place for so long, Mrs. Carroll suffered injuries. I would therefore hold that Mrs. Carroll also satisfied the second stated requirement.

The majority also interprets the language of § 3–2A–04(b) as requiring that the Certificate identify the specific individual or individuals who breached the standard of care. I agree. I disagree with the majority, however, that Mrs. Carroll's Certificate is incomplete because it fails to comply with this requirement. I acknowledge that Dr. Simmons–Clemmons filed a statement that included the names of five different physicians, only two of whom are the named health care providers/appellees in this case. The Certificate, however,

---

**1.** The majority recognizes that "proximate cause" is a legal term but states that "[w]e do not think, however, that its meaning, in this context, is so obtuse that a person would need to spend a great deal of time studying the definition to understand its meaning." I agree with this statement. I disagree, however, that an affirmation from an attesting physician that a defendant-health care provider acted in such a way that makes clear that his or her conduct was the proximate cause of a plaintiff's alleged injury, fails to satisfy the statutory requirements simply because it fails to include the magic words, proximate cause. I believe that the substance of the statement is more important than the inclusion of the specific legal terminology or conclusion.

specifically mentioned Dr. Imoke and Dr. Konits and made clear that the physicians failed to communicate to Mrs. Carroll that her catheter needed to be removed after she completed chemotherapy. Mrs. Carroll made clear that Dr. Imoke was the health care provider who placed the catheter inside her chest and that Dr. Konits's failure to contact Dr. Imoke and make him aware that the catheter could be taken out, resulted in it being left inside her chest for two and one-half years.[2] I would therefore conclude that the Certificate satisfied the requirements in this regard and the Circuit Court was therefore incorrect to dismiss the case on the grounds that Mrs. Carroll failed to file a proper Certificate. The purpose of the statute is to weed out non-meritorious claims, not to dismiss meritorious claims for frivolous reasons.

The majority does not address the other contentions made by Drs. Konits and Imoke. I believe it is important for the Court to address these contentions. Drs. Konits and Imoke contend that the Certificate must state that Dr. Simmons–Clemmons spends no more than 20 percent of her professional time on personal injury-related litigation, that she is board certified in the same fields as Drs. Konits and Imoke and that she has a similar medical background to Drs. Konits and

---

2. Recently, in *Barber v. Catholic Health Initiatives, Inc.*, 174 Md.App. 314, 921 A.2d 811 (2007), the intermediate appellate court examined previous health care claims cases of this State, including this Court's decision in *Walzer*, and determined that the identity of the physicians who allegedly breached the standard of care must be discernable from the Certificate, and that a failure to do so will result in dismissal. In that case, the claimant named all twelve defendants in the original claim and defined them collectively as the "Health Care Providers." The court determined that it was clear from the Certificate, about whom the physician was speaking, when the attesting physician explained that the "Health Care Providers" breached the standard of care. The court stated that "[t]he Certificate cannot be analyzed in a vacuum; it must be considered in the context of the Statement of Claim that it supported, which had already been filed with the HCAO." The court noted, however, that "[t]o be sure, if appellants had re-named in the Certificate each person or entity listed in the Statement of Claim, this appeal would have been avoided." *Barber*, 174 Md.App. at 351, 921 A.2d at 833. I agree that the inclusion of the specific names is the better practice, as Dr. Simmons–Clemmons indicated in her amended Certificate.

Imoke.  I would reject these contentions.  The 20 percent declaration is not at issue in this case because Dr. Simmons–Clemmons explicitly stated in her amended Certificate that she spends no more than 20 percent of her time on personal injury claims.  Notwithstanding, I do not read the Health Care Malpractice Claims Statute to require that the Certificate include any of this information.  Section 3–2A–04(b)(4) identifies a precise limitation on the qualifications of an attesting health care provider:

> A health care provider who attests in a certificate of a qualified expert or who testifies in relation to a proceeding before an arbitration panel or a court concerning compliance with or departure from standards of care may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims.

The other applicable provision as to Drs. Konits and Imoke's contentions is § 3–2A–02(c), entitled *"Establishing liability of health care provider; qualifications of persons testifying,"* part (2)(ii)(1.), which states that any health care provider who attests in a Certificate to a defendant-health care provider's departure from the standards of care:

> A.  Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action;  and

> B.  Except as provided in item 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified in the same or a related specialty as the defendant.

The above-quoted language from § 3–2A–04(b)(4) and § 3–2A–02(c)(2)(ii)(1.) demonstrates the General Assembly's intent to place limitations on the qualifications of experts who attest to a defendant's breach of the standard of care and that such a

breach proximately caused the plaintiff's injuries. By requiring that experts have similar training and are board certified in the same field(s) as the defendant-health care providers about whose behavior the expert is attesting, clearly, the Legislature sought to ensure that the attesting experts are qualified to render an opinion about the defendant-health care providers' alleged departure from the standards of care.

The General Assembly stated that attesting health care providers "may not devote annually more than 20 percent," "shall have had clinical experience," and "shall be board certified in the same or a related specialty" not that they must *attest* to the fact that they do not devote annually more than 20 percent, have the same clinical experience and are board certified in the same field as the defendant. I would therefore decline to hold that the General Assembly intended for such statements to be included in the Certificate and that without such statements, the claim must be dismissed on the ground that the Certificate is deficient.

We explained in *Debbas v. Nelson,* 389 Md. 364, 383, 885 A.2d 802, 814 (2005) that

> [t]he strictly limited time period provided for securing a valid Certificate . . . demonstrates the General Assembly's intention that the findings and opinions contained therein would be preliminary. To interpret the statute otherwise might effectively preclude many malpractice suits from ever proceeding on the merits.

Parties can instead obtain this information through discovery. As stated by the Maryland Trial Lawyers Association, which filed an Amicus Curiae brief, "a simple interrogatory would discover the information that [Dr.] Konits asks to be amended into § 3–2A–04(b), and . . ., under § 3–2A–04(b)(3)(ii), such discovery always was contemplated by the Legislature." *See* Md.Code (1974, 2002 Repl.Vol., 2006 Cum. Supp.), § 3–2A–04(b)(3)(ii) of the Courts & Judicial Proceedings Article (stating that "[d]iscovery is available as to the basis of the [C]ertificate"). As we stated in *Koons Ford v. Lobach,* 398 Md. 38, 62–63, 919 A.2d 722, 737 (2007):

If [the Legislature] intended otherwise, then it certainly had, and still has, the ability to say so. As we have previously explained, however, "[i]t is not the task of the Judiciary to rewrite the Statute. . . . The court's charge in interpreting a statute is to determine the intent of the Legislature, not to insert language to change the meaning of a statute." *Walzer,* 395 Md. at 584–85, 911 A.2d at 439–40 (citations omitted).

I would conclude that the information regarding the attesting expert's professional attributes is not required to be contained in the Certificate. That is, a claimant can get into court without it; however, I stress that it would be the better practice to include such information in the Certificate so that claimants can avoid unnecessary challenges to the qualifications of the person who submitted the document. Moreover, if the attesting health care provider fails to meet these statutory professional requirements, it would appear that the claimant is not arbitrating in good faith,[3] as is required. *Karl v. Davis,* 100 Md.App. 42, 50, 639 A.2d 214, 218 (1994). The issue before us in this case, however, is what must be included within the four corners of the Certificate for it to be valid, not who is qualified to attest to a Certificate.

Furthermore, Drs. Konits and Imoke argue that Mrs. Carroll's amended Certificate is incomplete because Dr. Simmons–Clemmons did not state that her opinions are based upon a reasonable degree of medical probability. Essentially, the doctors, by this contention, raise issues of admissibility and reliability with regard to the Certificate. Nothing in the language of the Health Care Malpractice Claims Statute, however, requires that such an assertion be made in the

---

**3.** Claimants must arbitrate in good faith and a failure to do so will result in dismissal of the claim. *See Karl v. Davis,* 100 Md.App. 42, 50–51, 639 A.2d 214, 218 (1994) (stating that "[t]o allow less than a legitimate good faith attempt before the [Health Care Alternative Dispute Resolution Office] to satisfy the mandatory condition precedent would clearly thwart the legislative intent that all claims of medical negligence over the appropriate jurisdictional amount be fairly presented and tried before the [Health Care Alternative Dispute Resolution Office]").

Certificate. There exists a test for admitting into evidence an expert medical opinion. *See* Maryland Rule 5–702 (addressing the testimony by experts at trial); *Trimble v. State,* 300 Md. 387, 404, 478 A.2d 1143, 1151 (1984) (stating that the party seeking to elicit an opinion must establish that the witness is qualified to express it and that the trial judge must decide that issue as a preliminary matter of law). There also exists a requirement that the expert's opinion be held to a "reasonable degree of medical probability" to ensure that the expert's opinion is more than speculation or conjecture. *See Karl,* 100 Md.App. at 51–52, 639 A.2d at 219 (stating that "[w]hile [an] expert opinion must be based upon more than mere speculation, it need not be expressed with absolute certainty. . . . We have required expert opinions to be established within a reasonable degree of probability.") *See also Fink v. Steele,* 166 Md. 354, 363, 171 A. 49, 53 (1934); *Charlton Bros. Transp. Co. v. Garrettson,* 188 Md. 85, 94, 51 A.2d 642, 646 (1947).

Drs. Konits and Imoke also construe this Court's holding in *Walzer v. Osborne,* 395 Md. 563, 911 A.2d 427 (2006), to mean that, in all circumstances, two separate documents must be filed—a Certificate and an attesting expert report—and that, because Dr. Simmons–Clemmons filed only one document, it is deficient. The Court said in *Walzer* that the expert's report must be attached to the Certificate. We based that conclusion on our reading of the statutory language of § 3–2A–04(b)(3)(i) that "[t]he attorney representing each party, or the party proceeding pro se, shall file the appropriate certificate with a report of the attesting expert *attached*" (emphasis added).

In this case, Mrs. Carroll failed to attach a separate document, an attesting expert report, to the Certificate that she submitted to the Health Care Alternative Dispute Resolution Office. Notwithstanding, as clarification of our decision in *Walzer,* and in response to the appellees' contention in this case, while it is clear that the Legislature intended for the attesting expert report to be attached to the Certificate, consistent with that statutory mandate, I see no reason why both documents may not comprise separate parts of a single document and thereby become incorporated into one docu-

ment, just as a report attached to the Certificate, at the time of the initial filing, would be a complete certification.[4]  The Legislature's intent in enacting the Health Care Malpractice Claims Statute was to weed out non-meritorious claims by requiring claimants to submit certain information to the Health Care Alternative Dispute Resolution Office.  There is no reason why an attesting expert report, or Certificate, if filed with the intent to incorporate a previously filed report or Certificate, or a Certificate containing a section that includes the attesting expert's report, is not a complete certification of merit, just as a report attached to the Certificate would be a complete certification. The essence of the statutory requirement is that the Certificate is not complete unless there is a timely certification and report filed in the Health Claims case.

As the majority points out, we explained in *Walzer,* 395 Md. at 583, 911 A.2d at 438–39, that

> the attesting expert report must explain how or why the physician failed or did not fail to meet the standard of care and include some details supporting the certificate of qualified expert. . . .  Accordingly, the expert report should contain at least some additional information and should supplement the Certificate.  Requiring an attesting expert to provide details, explaining how or why the defendant doctor allegedly departed from the standards of care, will help weed out non-meritorious claims and assist the plaintiff or defendant in evaluating the merit of the health claim. . . .

In *Walzer,* 395 Md. at 568, 911 A.2d at 430, the attesting physician stated simply that:

> Based on my training, expertise and review of the records, it is my opinion that there were deviations from the

4.  In those cases where a Certificate is filed and subsequently there is filed in the case, a report to supplement the Certificate, the subsequent filing of a report may be made for the express purpose of completing the Certificate and thereby incorporating the report as an attachment to the previously filed Certificate.  To avoid dismissal of the underlying claim, however, the subsequent filing must be timely.

standards of care and said deviations were the proximate result of Claimant Keith Osborne's injury.

In that case, the attesting physician failed to include any information about how the physician deviated from the standard of care and how the said deviations from the standard of care caused Mr. Osborne's injury; we therefore held that the Certificate was deficient because it lacked the information that would have constituted an attesting expert report. In this case, Dr. Simmons–Clemmons included enough information, in accordance with *Walzer*, within the four corners of her amended Certificate, thereby supplementing the certification consistent with the statutory requirements of § 3–2A–04(b) and § 3–2A–04(b)(3)(I). Although, for purposes of clarity, she could have titled the document, "Certificate of Qualified Expert and Report," it amounts to our exalting form over substance to invalidate the Certificate because of that omission. In addition to stating that Drs. Konits and Imoke breached the applicable standard of care and that their breach caused Mrs. Carroll's injuries, Dr. Simmons–Clemmons stated that the physicians failed to communicate effectively with Mrs. Carroll, regarding the timely removal of the catheter, and that the physicians failed to remove the catheter in a timely manner. She explained that Mrs. Carroll received treatment that fell below the standard of care "in regards to removal of the Hickman catheter after chemotherapy." I would therefore conclude that Dr. Simmons–Clemmons successfully satisfied, within one document, the statutory requirements of the Certificate and attesting expert report, as explicated by this Court in *Walzer*.

I would also reject Drs. Konits and Imoke's contention that the Certificate must be a "formal" document, and not in letter form, as was the case here. Nowhere in the Health Care Malpractice Claims Statute does it require that the attesting expert's affirmations be contained in a "formal" document; the statute simply requires that the attesting health care provider specifically identify the health care provider about whom he or she is speaking, and that the certifying health care provider attest to the other health care provider's departure from the

standard of care and that such a departure proximately caused the plaintiff's injuries.

Therefore, I respectfully dissent. Chief Judge Bell authorizes me to state that he joins the views expressed in this dissent.